08/03/2022

JAMES WILLEY SHAYLER

```
 1                  SUPERIOR COURT OF CALIFORNIA

 2                     COUNTY OF LOS ANGELES

 3                   (Spring Street Courthouse)

 4

 5

 6    JAMES SHAYLER,                    )
                                        )
 7                       Plaintiff,     )
              vs.                       ) Case No. 21TRCV00820
 8                                      )
      PRAIRIE HOSPITALITY GROUP INC.    )
 9    et al.                            )
                         Defendants.    )
10    _____ )

11

12
      Videoconference
13    Deposition of:        JAMES WILLEY SHAYLER
                            (Appearing Remotely)
14

15    Date and Time:       Wednesday, August 3, 2022
                           1:05 p.m.
16

17    Place:               20062 SW Birch Street
                           Suite 200
18                         Newport Beach, California
                           (Deponent's location)
19

20    Reporter:            Linda A. Simpson, CSR,
                           RPR, RMR, CRR, CCRR
21                         Certificate No. 2266

22

23

24

25
```

08/03/2022

JAMES WILLEY SHAYLER

```
 1          Videoconference deposition of JAMES WILLEY SHAYLER,

 2    taken remotely stenographically by Linda A. Simpson,

 3    Certified Shorthand Reporter, Certificate No. 2266, and a

 4    Deposition Officer of the State of California, commencing

 5    on Wednesday, August 3, 2022, 1:05 p.m., at the

 6    deponent's location, Manning Law Firm, 20062 Southwest

 7    Birch Street, Suite 200, Newport Beach, California.

 8

 9    APPEARANCES OF COUNSEL:

10
          For the Plaintiff:
11
               (Appearing Remotely)
12             MANNING LAW FIRM
               Attorneys at Law
13             BY:  BABAK HASHEMI, ESQ.
               20062 SW Birch Street, Suite 200
14             Newport Beach, California  92660-1519
               949-464-8529
15             babakhashemilaw@gmail.com

16
          For the Defendants:
17
               (Appearing Remotely)
18             SAHELIAN LAW OFFICES
               Attorneys at Law
19             BY:  ARA SAHELIAN, ESQ.
               25108 Marguerite Parkway, Suite A
20             Mission Viejo, California  92692
               949.859.9200
21             sahelianlaw@me.com

22
          Also Present Remotely:
23
               Audrey Fung, exhibit technician
24

25
```

SIMPSON DEPOSITION SERVICES (800) 505-9994

08/03/2022

JAMES WILLEY SHAYLER

```
 1                    I N D E X

 2   WITNESS EXAMINATION                              PAGE

 3   Mr. Sahelian - - - - - - - - - - - - - - - - -  5, 136

 4   Mr. Hashemi  - - - - - - - - - - - - - - - -  129, 141

 5

 6                  E X H I B I T S
                                           Page Marked
 7                                             or
     Defendant's                           Referenced
 8
     Exhibit 1      2-page Notice of Deposition       39
 9
     Exhibit 2      4-page 2/11/2020 report by Dr. Ananian 39
10
     Exhibit 3      1-page 12/8/2016 report by Dr. Plut    42
11
     Exhibit 4      4-page 1/15/2020 report by Dr. McCloy  43
12
     Exhibit 5      2-page 3/2/2020 report by Dr. McCloy   44
13
     Exhibit 6      3-page April 2020 report by Dr. McCloy 46
14
     Exhibit 7      2-page May 2020 report by Dr. McCloy   47
15
     Exhibit 8      3-page report by Dr. Su               47
16
     Exhibit 9      3-page July 2020 report by Dr. McCloy  48
17
     Exhibit 10     3-page September 2020 report by McCloy 49
18
     Exhibit 11     3-page September 2020 report by McCloy 55
19
     Exhibit 12     5-page Yashar Neurosurgery            57
20                    September 2020 report

21   Exhibit 13     5-page Yashar Neurosurgery            60
                       October 2020 report
22
     Exhibit 14     5-page Yashar Neurosurgery            60
23                    December 2020 report

24   Exhibit 15     18-page October 2021 report by        61
                       Dr. Mir
25
```

SIMPSON DEPOSITION SERVICES (800) 505-9994

08/03/2022

JAMES WILLEY SHAYLER

```
                                                         Page 4
 1                      I N D E X (Continued)

                                              Page Marked
 2                                                 or
      Defendant's                              Referenced
 3
      Exhibit 16     1-page photo of handicap parking      63
 4                      placard

 5    Exhibit 17     1-page photo (holding level and phone) 72

 6    Exhibit 18     1-page photo (leaning over, holding    73
                        level)
 7
      Exhibit 19     1-page photo (taking photo)            74
 8
      Exhibit 20     1-page photo (taking photo)            74
 9
      Exhibit 21     1-page photo (bent, taking photo)      74
10
      Exhibit 22     1-page photo (walking towards          75
11                      sidewalk)

12    Exhibit 23     1-page photo (stepping up)             76

13    Exhibit 24     1-page photo (walking on door mats)    77

14    Exhibit 25     1-page photo (Ziploc bag with change)  79

15    Exhibit 26     1-page photo (approaching step-down)   80

16    Exhibit 27     1-page photo (walking on asphalt)      81

17    Exhibit 28     1-page photo (opening car door)        82

18    Exhibit 29     1-page photo (Irish Pub parking lot)   83

19

20
                     WITNESS INSTRUCTED TO NOT ANSWER
21
                         (Indicated with **)
22
                            Page    Line
23
                             36      16
24
                            125      14
25
```

08/03/2022

JAMES WILLEY SHAYLER

Page 5

```
 1     Newport Beach, California - Wednesday, August 3, 2022
 2                    *   *   *   *   *
 3                    JAMES WILLEY SHAYLER,
 4     called as a witness, having been first duly sworn, was
 5     examined and testified as follows:
 6                         EXAMINATION
 7         Q.   BY MR. SAHELIAN:  Good afternoon, Mr. Shayler,    16:00
 8     how are you feeling today?
 9         A.   Okay.
10         Q.   Are you under medication as we speak?
11         A.   I do take some medication, yes.
12         Q.   Do you take medication that might impair your    13:05
13     memory?
14         MR. HASHEMI:  As far as you know.
15         THE WITNESS:  I don't believe so.
16         Q.   BY MR. SAHELIAN:  Okay.  Would you be kind
17     enough to let us know what medication you've taken in the
18     past 24 hours if it is likely to impair your memory?
19         A.   I just take blood pressure medication,           13:06
20     cholesterol medication.  That's it.
21         Q.   Okay.
22         A.   And muscle relaxers.
23         Q.   Okay.  Please identify the muscle relaxers.
24         A.   I'm not sure the name of them.
25         Q.   At one time you were on OxyContin; is that       13:07
```

JAMES WILLEY SHAYLER

 1   correct?

 2       A.    Yes.  Uh-huh.

 3       Q.    And are you still using OxyContin?

 4       A.    I tried --.  No, I'm off the pain medication.

 5       Q.    Okay.  Well, I want to congratulate you for

 6   that because I know a lot of people who use it and have      13:07

 7   had extreme difficulty getting off, so my hat's off to

 8   you, Mr. Shayler.

 9       A.    Thank you.

10       Q.    I understand you have some disabilities, and

11   if you would be kind enough to answer a few questions

12   about that.  I'm going to start with your right arm.  Can

13   you tell me what you can and cannot do with your right      13:07

14   arm?

15       A.    My right arm, I had surgery on it and pins put

16   in my elbow.  And I got atrophy in my hand.  I got a

17   pinched ulnar nerve in my -- my elbow and had to

18   reconstruct it.  And it's hard for me to grasp things, to

19   write, to eat.  It's very hard to hold utensils, and I      13:08

20   have limited use of my right arm.  Or hand.

21       Q.    On an ordinary day, sir, do you use a knife, a

22   fork, a spoon, or do you have somebody else feed you?

23       A.    No, I'm -- I'm able to eat myself.

24       Q.    Okay.  What can you and can you not do with

25   your --?  Well, let me rephrase that because I don't want   13:09

JAMES WILLEY SHAYLER

Page 7

```
 1    Mr. Hashemi to object to a compound question.

 2              What can you not do specifically with your

 3    right arm?  And that includes the entire arm and hand.

 4         A.    If doors are too heavy, sometimes it causes me

 5    pain to open doors.  See, what else?  It's hard for me to    13:09

 6    do little small things with my hand.  Like doing buttons

 7    and things like that I have problems with.

 8         Q.    In other words, buttoning your shirt is

 9    difficult?

10         A.    Yes.

11         Q.    Anything else that you cannot do with your       13:09

12    right arm and hand?

13         A.    It's difficult for me to write with my right

14    arm because I am right-handed, it's so difficult, but I'm

15    able to write, but it's sometimes not legible.

16         Q.    All right.  Let's move on to your --.  Well,

17    before we do that, have you told me everything that you

18    cannot do with your right arm and hand?                     13:10

19         A.    I believe so.

20         Q.    Okay.  Let's move on to your left arm and

21    hand.  If you would be kind enough to tell me what you

22    can and cannot do with your right arm and hand?

23         A.    I was talking about my right arm and hand when

24    we were discussing my -- this hand, my right hand.  My

25    left hand is okay.                                          13:10
```

1      Q.    I'm sorry, I'm sorry for inter -- I apologize

2    for interjecting.  I meant tell me everything you can and

3    cannot do with your left arm and hand.

4      A.    My left arm and hand seems to be working okay.

5    I do have some -- some shoulder issues; but other than

6    that, my hand's fine.  My left hand and arm is fine.      13:11

7      Q.    Very well.  Let's go to your right leg.

8    That's including the foot.  So from the hip down to the

9    foot, tell me what you can and cannot do with your right

10   leg and foot.

11     A.    Well, start down from my foot.  I have          13:11

12   neuropathy on my feet.  They -- my bottom of my feet

13   burn, and they're pins and needles.  And I don't have

14   good mobility with my feet, I'm --.  My mobility is off.

15   I -- I fall.  And because of neuropathy, I'm unsteady on  13:12

16   my feet.

17            And then I've had my right leg, I had a knee

18   replacement on my right leg, and the surgery didn't go

19   that well, and I still have pain and -- and stiffness in

20   that knee.

21     Q.    With respect to your right leg and foot, what    13:12

22   surgeries have you had?

23     A.    A knee replacement on my right leg.

24     Q.    Any other surgeries?

25     A.    No.  Oh, yeah, I've had other surgeries.  I

JAMES WILLEY SHAYLER

 1   had on the left --

 2       Q.    No, no, no.  I'm strictly limiting my question

 3   to your right leg and foot.

 4       A.    No other surgeries, sir.                              13:13

 5       Q.    With respect to your left leg and foot, can

 6   you tell me what you can and cannot do?

 7       A.    With my left leg?  Same -- same with my left

 8   leg.  I have neuropathy from a pinched sciatic nerve.  My

 9   L4-L5-S1 bilaterally is pinched, causes the neuropathy on    13:13

10   both feet, including my left.  And I had a knee

11   replacement on my left as well and my right, so I've had

12   two knee replacements.  And again the surgeries left my

13   knees stiff and painful.

14       Q.    Have you told me all the surgeries you've had

15   on your legs, both legs?

16       A.    Yes.

17       Q.    With respect to both hips, have you had hip       13:14

18   replacement surgery?

19       A.    No.

20       Q.    What are the conditions of your hips?

21       A.    They seem to be okay.  I do have a limp.  One

22   of the surgeries left one of my legs longer than the

23   other, and it leaves me with a limp.  I don't believe      13:14

24   it's my hip.

25       Q.    Now when you're at home, do you walk or do you

JAMES WILLEY SHAYLER

```
 1   use a wheelchair?

 2        A.   When I'm at home, I use a -- inside my condo,

 3   I use a -- a cane, sometimes a walker.  Sometimes if I'm          13:15

 4   just going a short distance, I may not use either, if I'm

 5   just going a little bit.

 6        Q.   Do you live by yourself?

 7        A.   Yes, I do.

 8        Q.   Do you cook on your own?

 9        A.   Limited, yes.

10        Q.   When you do, when you're in the kitchen, do

11   you use a cane or a walker, any other device to help you?        13:15

12        A.   If it's a bad day, I'll use a walker.  If it's

13   a good day, I'll use a cane -- or if it's a good day, I

14   won't use a cane.  If it's a good day even.

15        Q.   If it's a good day, you will also not use a

16   cane anywhere around the house; is that correct?

17        A.   Yes, if it's a good day and I'm only be up for        13:16

18   short periods of time, I may not use either/or.

19        Q.   Do you have a wheelchair at home?

20        A.   No, I just use a walker and a cane.

21        Q.   Do you have a wheelchair in your car?

22        A.   No, just a walker.

23        Q.   Where do you leave your walker?  In the car or

24   at home?                                                          13:17

25        A.   I have a walker at home, and I have one in my
```

08/03/2022

JAMES WILLEY SHAYLER

Page 11

```
 1   car.  And a cane.  At all times.

 2       Q.    So when you're making your way from your home

 3   to your car, what do you do with either device?

 4       A.    When I get up in the morning, I -- I see how

 5   my legs are.  If they are wobbly, I will use a walker.      13:17

 6   If they seem to be okay, then I'll use a cane, but I

 7   always leave the cane -- at least a cane when I walk to

 8   my car.

 9       Q.    So are there instances where you end up with

10   two canes in the car?

11       A.    No.  I have one cane.  I take it in and out of

12   my car, so I'm always walking with a cane to my car and

13   back.  Or a walker.                                         13:17

14       Q.    I see.  So you only own one walker and one

15   cane; is that correct?

16       A.    No, I own two walkers and one cane.

17       Q.    So you always leave one walker in the car; is

18   that correct?

19       A.    Yes.

20       Q.    And to get from your house to your car, do you

21   have to take steps?

22       A.    No, I -- I don't use -- I don't use stairs at    13:18

23   all.  I've fallen and have to go to the hospital.  I use

24   an elevator.

25       Q.    So you do not use steps at all?
```

JAMES WILLEY SHAYLER

Page 12

```
 1        A.    Very dangerous for me to use steps.
 2        Q.    So you avoid steps as much as you can;        13:18
 3   correct?
 4        A.    Correct.
 5        Q.    In fact, you never use steps; correct?
 6        MR. HASHEMI:  Objection, argumentative.
 7        THE WITNESS:  There are times when I've had to use
 8   steps, yes.
 9        Q.    BY MR. SAHELIAN:  What would be the
10   circumstance under which you would elect to use a step?
11        MR. HASHEMI:  Objection, argumentative.  Overbroad.
12            Go ahead.                                        13:19
13        THE WITNESS:  Well, if I'm going somewhere and
14   there's not an elevator, I guess I'd have to use steps,
15   but I try not to go places that don't have an elevator,
16   that just have steps.
17        Q.    BY MR. SAHELIAN:  What about a single step to
18   go from --?  Strike that.
19            If you have to step up onto a sidewalk from
20   the asphalt in a parking lot, what do you do?
21        A.    I lift my front wheels up, and then I push my
22   back wheels up, and I make sure I'm steady when I do
23   that.
24        Q.    The front wheels of what, sir?
25        A.    Of my walker.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 13

```
 1      Q.    I see.  So you avoid stepping up onto the        13:20
 2  sidewalk; is that correct?
 3      A.    Yes.
 4      Q.    And what would happen if you actually did try
 5  to step up on the sidewalk without the use of a walker?
 6      A.    Oh, I -- I could fall very easily, and I
 7  couldn't get up.                                           13:20
 8      Q.    What about if you had a cane with you?
 9      A.    That would help steady me.  But it's taking a
10  risk.
11      Q.    Am I to understand that the risks to you of
12  stepping up onto a sidewalk are so great that you avoid   13:21
13  it at all cost?
14      A.    Not at all cost, but I try to take a ramp or
15  some other way that's avoiding steps.
16      Q.    What about stepping down from the sidewalk
17  onto a parking lot?  Are you able to do that without a
18  walker?
19      A.    If it's a good day, yes, with a cane.  If it's  13:22
20  a bad day, no, I couldn't.  Got to be real carefully.  I
21  would lose my balance.
22      Q.    So you -- I'm sorry.
23      A.    I lose my balance.  I lose my balance real
24  easy.  I have to be careful.
25      Q.    Okay.  Now in the past year, how many times
```

08/03/2022

JAMES WILLEY SHAYLER

 1  have you fallen and gone to the hospital?                13:22

 2      A.    Three -- three or four times.

 3      Q.    All right.  Do you have the records?

 4      A.    No.

 5      Q.    All right.  So in the past year, so that would

 6  be in the past 12 months, you testified just now that

 7  you've fallen and gone to the hospital as a result four   13:22

 8  times; --

 9      A.    Three or four.

10      Q.    -- is that right?

11      A.    Yeah, three or four times.  Here's -- here's

12  my last fall (indicating).  And my knee, I have

13  (simultaneous dialog).

14      MR. SAHELIAN:  All right.  The record should show

15  that Mr. Shayler was demonstrating a wound on his elbow.

16      Q.    So, Mr. Shayler, you might want to give me a    13:23

17  chance to finish a statement so the court reporter does

18  not have to figure out what it is you are saying.

19      A.    Okay.

20      Q.    So in the past 12 months, you've fallen four

21  times and gone to the hospital as a result.               13:23

22            Would you tell me the first time --?  What I

23  meant was could you tell me about the first time where

24  you were when you fell?

25      A.    There were steps.  There were steps going down

08/03/2022

JAMES WILLEY SHAYLER

Page 15

```
 1   to my car, and I took the steps, and I fell like three    13:24
 2   steps down on the asphalt.
 3        Q.   Where were you at the time?
 4        A.   At my condominium.
 5        Q.   Did you call 911?
 6        A.   No.
 7        Q.   Did you drive yourself to the hospital?
 8        A.   Eventually, yes.                                 13:25
 9        Q.   Was it that day?
10        A.   No.
11        Q.   When?
12        A.   About two or three days later, I was still in
13   pain, and I thought I may have bruise a rib or something
14   in my chest so I went to the hospital.
15        Q.   Forgive me for misunderstanding you if I did.
16   Did you not testify that at your place of residence you   13:25
17   had no need to negotiate steps to get to your car?
18        A.   There's two ways.  You can take steps or you
19   can take the elevator.  And after that fall, I've always
20   taken the elevator.
21        Q.   So if I'm to understand your testimony, you     13:25
22   avoid stairs because of that fall that occurred less than
23   a year ago; is that correct?
24        A.   That's correct.
25        Q.   All right.  Now tell me where you were located
```

08/03/2022

JAMES WILLEY SHAYLER

Page 16

| | | |
|---|---|---|
| 1 | when you fell the next time after that. | 13:26 |
| 2 | A.    In my apartment.  Or in my condominium. | |
| 3 | Q.    Okay.  How did you fall? | |
| 4 | A.    My leg just gave out and I fell, and I | |
| 5 | couldn't get up.  I had to call 911.  I had to call | |
| 6 | security and then 911. | 13:26 |
| 7 | Q.    Did you see a doctor? | |
| 8 | A.    Yes. | |
| 9 | Q.    Did he make a recommendation? | 13:27 |
| 10 | A.    Yes, the doctors made a recommendation. | |
| 11 | Q.    What was his recommendation relative -- | |
| 12 | A.    That I -- that I continue using the walker and | |
| 13 | be very careful. | |
| 14 | Q.    And have you followed his recommendation?  His | |
| 15 | or her, I should say. | |
| 16 | A.    Yes. | |
| 17 | Q.    Tell me about the third fall.  Where were you? | |
| 18 | That's the -- excuse me, that's the third fall within a | 13:27 |
| 19 | year. | |
| 20 | A.    Yeah, that would be in my apartment again. | |
| 21 | Q.    How did it happen? | |
| 22 | A.    My leg just gave out.  My left leg just -- or | |
| 23 | my right leg gave out that time, just gave out, and I | |
| 24 | fell.  And I think I called security, and they came up | 13:28 |
| 25 | and helped me get up. | |

08/03/2022

JAMES WILLEY SHAYLER

Page 17

```
 1       Q.    Did you go to the hospital?

 2       A.    Yes.

 3       Q.    How many days later?

 4       A.    That day I went, drove myself.

 5       Q.    Did you see a doctor?

 6       A.    Yes.

 7       Q.    What did he or she say?                        13:29

 8       A.    That I really need to be careful.  I had to

 9  have stitches on my forehead.  Staples.

10       Q.    All right.  I'm sorry to hear that,

11  Mr. Shayler.

12       A.    Yeah.

13       Q.    Tell me about your last fall.  I'm assuming   13:29

14  there's one more in the past 12 months; correct?

15       A.    Yeah, it was over the weekend at my brother's

16  house.

17       Q.    Tell me what happened.

18       A.    I was getting my walker out of my car, and

19  there was a curb, and I didn't -- I didn't -- I tripped  13:29

20  on the curb, and I fell.

21       Q.    Did someone take you to the hospital?

22       A.    I didn't go to the hospital on that time.  No.

23  My brother was there.

24       Q.    All right.  Given you've had these unfortunate 13:30

25  incidents, Mr. Shayler, and I'm sure very painful and
```

08/03/2022

JAMES WILLEY SHAYLER

Page 18

1   frustrating, have you committed to possibly using a

2   wheelchair to avoid these falls?

3        A.   I talked to a doctor about that, and he

4   suggests that I keep using the walker.  He was afraid

5   that a wheelchair would leave me less mobility and would    13:30

6   make my legs weaker.

7        Q.   With respect to walking, using a walker, today

8   if you were to use a walker, how steady would you feel on

9   your feet?

10       A.   Today's a fairly good day.  Don't feel uneasy    13:31

11  on my feet, but I still use a walker.

12       Q.   Mr. Shayler, I want you to know that we can

13  take as many breaks as you need.  If you need to use the

14  restroom, by all means, please let me know.  If you need

15  a mental break, by all means, please let me know.           13:31

16       A.   Okay.

17       Q.   Is that a deal?

18       A.   Yeah.

19       Q.   All right.  Having said that, I'm going to

20  take a five-minute break if that's okay with you.

21       A.   Yeah.  Yeah, sure it is.

22       MR. HASHEMI:  I won't object.

23       MR. SAHELIAN:  All right.

24            (Recess.)

25       Q.   BY MR. SAHELIAN:  How are you feeling?  Okay?     13:32

08/03/2022

JAMES WILLEY SHAYLER

Page 19

1      A.     Yeah.

2      Q.     All right.  Back on the record.  Mr. Shayler,

3   you testified that you had fallen once or more in your

4   condominium in the past 12 months.  Is that correct?          13:40

5      MR. HASHEMI:  Misstates prior testimony.

6          Go ahead, Mr. Shayler.

7      THE WITNESS:  Yes.

8      Q.     BY MR. SAHELIAN:  Was it once or twice in the

9   past 12 months?

10     A.     Twice.

11     Q.     So when you fell the first time, did you fall

12   entirely on the floor?                                          13:40

13     A.     Yes.

14     Q.     Describe for me if you would what sort of

15   floor covering you have throughout the house, starting

16   with the bedrooms to the bathrooms and kitchen.

17     A.     My whole floor's a wooden floor or vinyl

18   floor.  There is a couple places where there's carpet,        13:41

19   rugs.  But it's all wooden floor.

20     Q.     And when you say there's carpet rugs, where

21   are these carpet rugs located?

22     A.     In the living room and in the bedroom.

23     Q.     Describe the rugs in the bedroom.

24     A.     Just a -- an Oriental rug, probably six-by-           13:41

25   nine, and it's on the end of my bed.

08/03/2022

JAMES WILLEY SHAYLER

Page 20

```
 1      Q.    Is it a Persian rug?  I don't want to get your
 2  attorney excited here.
 3      MR. HASHEMI:  (Laughter.)
 4      THE WITNESS:  No, it's a machine-made rug.  It's not
 5  hand-knotted.  I wish it was.
 6      Q.    BY MR. SAHELIAN:  All right.  What about the
 7  carpet in the living room?                                13:42
 8      A.    Same thing, a little -- it's the same type of
 9  rug, Oriental rug or Persian-style rug, and it's machine
10  made.
11      Q.    What are the dimensions of it?
12      A.    Probably six-by-nine, something like that.
13      Q.    And the rest of your condominium is, if I have  13:42
14  it right, covered with wood?
15      A.    Yeah.
16      Q.    And linoleum?
17      A.    And linoleum, yeah.  Bathroom and the kitchen
18  are linoleum, and the rest is wood.
19      Q.    Do you have any steps ups --?  Strike that.
20            Do you have any locations in your condominium
21  inside your condominium where you have to step up or step
22  down to get into a room?                                  13:43
23      A.    No.
24      Q.    Are the transitions from one room to the other
25  smooth?
```

SIMPSON DEPOSITION SERVICES (800) 505-9994

JAMES WILLEY SHAYLER

```
 1      A.    Yes.

 2      Q.    So when you fell the first time, did you fall

 3   on the carpet, the wood, or the linoleum?

 4      A.    I believe the carpet and the wood.  That's in    13:44

 5   the front living room.

 6      Q.    And did your foot get caught on anything?

 7      A.    No.  My leg just gave out.

 8      Q.    And the second time you fell, what did you

 9   fall on?

10      A.    The wooden floor, and I bumped my head and had   13:44

11   to have eight staples in my -- my top of my head.  On the

12   side.

13      Q.    So that one was a headache, huh, Mr. Shayler?

14      A.    Yeah.  I didn't know how it happened.  But,

15   yes, it did, yeah.

16      Q.    I'm sorry to hear that.  Have you thought of     13:44

17   replacing your entire condominium with carpeting so you

18   wouldn't take such a hard fall?

19      A.    No.  Actually, the wood is easier for me to

20   get around with the wood.  It goes a little bit easier

21   with the walker and everything.  No, I'm going to keep

22   it.                                                       13:45

23      Q.    Can you contemplate a time, Mr. Shayler,

24   where -- I should say when you would simply for the sake

25   of safety use a wheelchair?
```

Page 22

1      A.    Well, I think maybe when I get older I may

2  have to use a wheelchair.  I'm not sure yet, you know,     13:45

3  what -- what's going to happen.

4      Q.    How certain are you of not falling when you

5  use a walker?  And I'm essentially limiting my question

6  to inside your condominium.                                13:46

7      A.    If I'm using my walker, I -- I'm steady, and I

8  know that if my leg gives out, I'm able to keep my --

9  standing up.  So as long as I use a walker, I'm fine.

10      Q.    Is that because if one leg gives out, at least

11  your other leg supports you while your arms give you

12  balance?  Is that the reason?

13      A.    Yes.  Uh-huh.

14      Q.    And the same question with your cane, how       13:46

15  certain are you inside your house of not falling if

16  you're using a cane?

17      A.    Well, the cane's usually for balance, gives me

18  more -- a little support and balance when I'm -- when I'm

19  standing and, you know, and walking.  But it's not -- you

20  know, if my leg gives out, I'm not sure a cane would --   13:47

21  would hold me.  I'm just not sure.

22      Q.    Now I know this could be difficult to answer

23  but on a day -- on any given day when you wake up, are

24  you able to predict whether one or the other leg is going

25  to give out on you that day?

JAMES WILLEY SHAYLER

Page 23

```
 1        A.    Well, when I -- I get up and before I get up,    13:48
 2   I have the walker right by my bed, and I usually grasp it
 3   and support myself and see how my legs are doing.  Yes.
 4   And if they feel like they are wobbly or unsure, then I
 5   continue using the walker that day.
 6        Q.    And what do you do if you have to leave the
 7   house and go somewhere?                                      13:48
 8        A.    If it's a bad day, I won't leave the house.
 9   I'll be sedentary, and I'll make -- change plans.
10   Whatever I'm going to do, I change plans.
11        Q.    So you're pretty careful nowadays avoiding a
12   fall by not leaving your condo if you're not feeling that   13:48
13   well?
14        A.    Yeah.  Yes, that's correct.
15        Q.    So you'll only leave the house -- when I say
16   "the house" it's obviously your condo -- when you're
17   relatively sure that if you're using a walker, you're not
18   going to fall; correct?                                      13:49
19        A.    Yes.
20        Q.    Now insofar as mobility in your legs, and my
21   question's limited to your right leg, are you able to
22   lift your foot off the ground if you're standing?           13:49
23        A.    My right leg?
24        Q.    Correct.
25        A.    Not without using a walker, I wouldn't --
```

08/03/2022

JAMES WILLEY SHAYLER

Page 24

1    couldn't do that.

2         Q.    Not at all?

3         MR. HASHEMI:  Objection, asked and answered,

4    argumentative.

5              Go ahead, Mr. Shayler.

6         THE WITNESS:  I'm not sure.                          13:50

7         Q.    BY MR. SAHELIAN:  If you were to decide --.

8    Well, strike that.

9              As we sit here today, if you were to stand up,

10   would you be able to lift one leg if you were holding

11   onto a cane?

12        MR. HASHEMI:  Objection, incomplete hypothetical,

13   not supported by admissible facts, calls for speculation.  13:50

14             Go ahead, Mr. Shayler.

15        THE WITNESS:  If it's a good day, I might be able

16   to.

17        Q.    BY MR. SAHELIAN:  What about a walker?

18        A.    With a walker I could.

19        Q.    How high up would you be able to lift your

20   right leg using a walker --

21        MR. HASHEMI:  Object --

22        Q.    BY MR. SAHELIAN:  -- to support yourself?

23        MR. HASHEMI:  Apologies.  Same objection.

24             Go ahead, Mr. Shayler.

25        THE WITNESS:  Maybe a couple feet.

08/03/2022

JAMES WILLEY SHAYLER

Page 25

1        Q.    BY MR. SAHELIAN:  All right.  Same question

2    with your left leg.

3        A.    Same answer, I could with a walker.  With a

4    cane, I'd have to be very careful, yeah.

5        MR. HASHEMI:  Same set of objections as with the

6    last question.

7        Q.    BY MR. SAHELIAN:  When was the last time that    13:51

8    you left your condominium, drove someplace, and walked

9    without a cane or a walker?

10       MR. HASHEMI:  Objection, compound, calls for

11   speculation.

12       THE WITNESS:  I'm not sure.  I'm not sure.  I'm not   13:52

13   sure.  I have lately.

14       Q.    BY MR. SAHELIAN:  Perhaps let's limit the

15   question to the past three months.  Have you in the past

16   three months left the house, gone anywhere, and walked    13:52

17   without a cane?

18       A.    Yes.

19       Q.    Where would that be?

20       A.    I went to the market at Ralphs and used their

21   basket like a walker and was able to steady myself short

22   periods of time and able to get some food and checking    13:53

23   out, as long as I used a basket.

24       Q.    How did you get from the car to the basket

25   without --?  Well, I'll just limit my question to:  How

JAMES WILLEY SHAYLER

Page 26

 1    did you get from the car to the basket?

 2        A.    The baskets -- I parked in the disability

 3    spot, and the baskets were right there, so I only had to

 4    walk ten feet to the -- to get the basket.                 13:53

 5        Q.    All right.  Other than your trip to Ralphs,

 6    any other places that you've visited in the past three

 7    months during which you've walked without either a walker

 8    or a cane?

 9        A.    Because of these falls, I don't think I have.    13:54

10    I just don't remember if I have.

11        Q.    All right.  With respect to your ankles, if

12    you were for instance on a recliner with your feet up,

13    would you be able to move your ankles in every direction?  13:55

14    And I'll start with the right ankle.

15        MR. HASHEMI:  Objection, compound, incomplete

16    hypothetical, not supported by admissible facts, and

17    calls for speculation and expert testimony.

18            You can answer, Mr. Shayler.

19        THE WITNESS:  Yes, I could.

20        Q.    BY MR. SAHELIAN:  In every direction; correct?

21        A.    I believe so, yes.

22        Q.    Which would also mean you would be able to

23    lift your foot up; correct?                                13:55

24        A.    Uh-huh.

25        MR. HASHEMI:  Same set of objections.

08/03/2022

JAMES WILLEY SHAYLER

Page 27

```
 1        Q.    BY MR. SAHELIAN:  That was a yes; correct?

 2        A.    Yes.

 3        Q.    Just so you know, Mr. Shayler, the court

 4   reporter gives me dirty looks if you say uh-huh.

 5        A.    Oh.

 6        Q.    She likes yes or no.

 7        A.    Okay.

 8        Q.    And, you know, she's very intimidating.  I've

 9   only known her for 20 years, and she intimidates the heck   13:55

10   out of me, so I have to be careful.

11        A.    (Laughter.)

12        MR. HASHEMI:  (Laughter.)

13        Q.    BY MR. SAHELIAN:  All right.  Same question

14   with the left foot.

15        A.    And what was the question?

16        Q.    Are you able to rotate your ankle in every

17   direction if you're sitting in a recliner with your feet

18   up?                                                          13:56

19        A.    Yes, I could.

20        MR. HASHEMI:  Same set of objections I interposed to

21   that last question too.

22        Q.    BY MR. SAHELIAN:  So when you're walking,

23   Mr. Shayler, are you able to lift your feet up on the --

24   off the ground a certain distance?  That's without using    13:56

25   a walker or a cane.
```

JAMES WILLEY SHAYLER

Page 28

```
 1        MR. HASHEMI:  Same set of objections previously
 2   interposed to this line.
 3             But you can answer the question if you think
 4   you understand it.
 5        THE WITNESS:  I think I could.  If it's a good day,
 6   I could.
 7        Q.   BY MR. SAHELIAN:  All right.  Now if it's a      13:57
 8   bad day, you avoid walking without a cane or a walker;
 9   correct?
10        A.   Yes, if it's a bad day, then I would use a
11   walker.  Help support myself.
12        Q.   So when you do use a walker and it is a bad
13   day and you're walking perhaps across a parking lot, are
14   you able to raise your feet as you're walking?            13:57
15        MR. HASHEMI:  Same set of objections with respect to
16   the previous set of questions that were presented.
17             You can answer the question.
18        THE WITNESS:  If it's a good day, yes.
19        Q.   BY MR. SAHELIAN:  And so what if it's a bad
20   day?
21        A.   Then I'd have to use my walker, and I'd be
22   careful lifting my legs up.  I can lift it up as long as
23   I'm supporting my balance with the walker.               13:58
24        Q.   So if you are using a walker and if it is a
25   bad day, Mr. Shayler, and you're walking across a parking
```

JAMES WILLEY SHAYLER

Page 29

1   lot, you are able to lift your foot in order to be able

2   to advance forward; is that correct?

3        MR. HASHEMI:  Objection, leading, argumentative,

4   lacks foundation, compound, calls for speculation, and

5   incomplete hypothetical, not supported by admissible          13:59

6   facts.

7             Mr. Shayler, go ahead.

8        THE WITNESS:  If it's a good day, I -- I may be able

9   to -- to do that.  Yes, I would be able to do that if

10  it's a good day.  If it's a bad day, I would stay home.

11  I wouldn't be going out.

12       MR. SAHELIAN:  Mr. Hashemi, I've got a great idea

13  for you.  We're going to take your objections and we're      13:59

14  going to create three different packages.  We call it

15  Package 1, Package 2 and 3.  That way you don't have to

16  get tired.  You just say Package 1.

17       MR. HASHEMI:  Can I hold up Ping-Pong paddles?  It

18  would be like 1, 2, 3?

19       MR. SAHELIAN:  You know what?  That would be

20  fabulous.  (Laughter.)

21       MR. HASHEMI:  (Laughter.)  But Madam Court Reporter

22  would not like that because that's not audible.

23       Q.   BY MR. SAHELIAN:  All right.  Now tell me what      13:59

24  city you live in, Mr. Shayler.

25       A.   Culver City.

08/03/2022

JAMES WILLEY SHAYLER

Page 30

```
 1        Q.    How long have you lived there?
 2        A.    About five years.                              14:00
 3        Q.    Are you currently employed?
 4        A.    No.
 5        Q.    What was your last employment?
 6        A.    Last employment was with Sysco.  I was a --
 7   with Sysco.
 8        Q.    Now if I understand correctly, Sysco makes     14:01
 9   networking products; is that correct?
10        A.    It's -- Sysco is a -- is a company that does
11   people's disability.  They determine if they are
12   disabled.  Yeah.
13        Q.    I see.
14        A.    Yeah, it's a different type of Sysco.  Yeah.
15        Q.    I see.  Okay.  And I believe at one time you   14:01
16   were a paralegal; is that correct?
17        A.    Yeah, for about --.  Yes.
18        Q.    For what period of time were you a paralegal?  14:01
19        A.    Roughly about 15 years.
20        Q.    Were you independent?
21        A.    No.
22        Q.    Who were you employed by?
23        A.    Disability Group and Health Advocates.
24        Q.    These are two law firms?
25        A.    Yes.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 31

| | | |
|---|---|---|
| 1 | Q.    Did you help at the time other disabled | 14:02 |
| 2 | persons file ADA lawsuits? | |
| 3 | MR. HASHEMI:  Objection, vague. | |
| 4 | Go ahead. | |
| 5 | THE WITNESS:  No. | |
| 6 | Q.   BY MR. SAHELIAN:  Now when you're walking | |
| 7 | across a parking lot and you see cracks in the asphalt, | 14:02 |
| 8 | what do you do? | |
| 9 | MR. HASHEMI:  Objection, vague. | |
| 10 | THE WITNESS:  I try to go around the cracks, yeah, | |
| 11 | that causes a problem, uneven. | |
| 12 | Q.   BY MR. SAHELIAN:  So if there's a way to go | 14:03 |
| 13 | around the crack, you do it; correct? | |
| 14 | A.    Yes. | |
| 15 | Q.    And if you see a little ramp or any ramp that | 14:03 |
| 16 | you need to use to get from the parking lot onto a | |
| 17 | sidewalk, what do you do? | |
| 18 | MR. HASHEMI:  Objection, vague, calls for | |
| 19 | speculation, incomplete hypothetical. | |
| 20 | THE WITNESS:  I have to use -- I use that ramp. | |
| 21 | Q.   BY MR. SAHELIAN:  Describe for me how you use | |
| 22 | a ramp using a walker. | |
| 23 | MR. HASHEMI:  Objection, vague, lacks foundation. | 14:04 |
| 24 | Go ahead. | |
| 25 | THE WITNESS:  State the question again? | |

08/03/2022

JAMES WILLEY SHAYLER

Page 32

1       Q.    BY MR. SAHELIAN:  Sure.  If you're walking

2  using a walker and you see a ramp and you want to use the

3  ramp to get up to the sidewalk level, how do you do it?

4       A.    I go up and if it -- if it's deeper than it          14:04

5  should be, then it gives me -- it makes it difficult for

6  me.  But I have -- I use -- I have to use a ramp so...

7       Q.    So you're familiar with the ADA guidelines;

8  correct?

9       A.    Yes.

10      Q.    You oftentimes take your own measurements;          14:05

11  correct?

12      MR. HASHEMI:  Objection, vague.

13      THE WITNESS:  Yes.

14      Q.    BY MR. SAHELIAN:  Do you know what the maximum

15  allowable slope on a ramp is under the ADA guidelines?

16      A.    Believe shouldn't be more than two inches,          14:05

17  something like that.  I don't know exactly.  I believe

18  two inches.

19      Q.    Two inches for how many feet?

20      A.    I'm not sure.

21      Q.    What about percentage-wise?  Can you tell me

22  what the allowable slope is on a ramp under the Americans

23  with Disabilities architectural guidelines?

24      MR. HASHEMI:  Objection, calls for expert testimony.     14:06

25      THE WITNESS:  No, I couldn't tell you.

08/03/2022

JAMES WILLEY SHAYLER

Page 33

```
 1       Q.    BY MR. SAHELIAN:  So what is the maximum slope
 2   percentage-wise that you can go up on?
 3       A.    What is the maximum percentage?
 4       MR. SAHELIAN:  I'm going to have the court reporter
 5   read my question.
 6       THE WITNESS:  Uh-huh.                              14:07
 7           (The record was read as follows:
 8             "So what is the maximum slope               14:06
 9         percentage-wise that you can go up on?")
10       MR. HASHEMI:  Objection, calls for speculation,   14:07
11   compound, and vague.
12       THE WITNESS:  I mean, if I -- if I have to use a
13   ramp, I'll have to go up, no matter whatever degree it
14   is, I have to go up there.
15       Q.    BY MR. SAHELIAN:  That doesn't answer my    14:07
16   question, Mr. Shayler.  Would you like me to have the
17   court reporter reread my question?
18       A.    The only other answer I can give you is I'm
19   not sure.
20       Q.    Same question with the same ramp going down. 14:07
21       A.    Again, I use the ramp, so whatever degree it
22   is, I have to use that ramp.
23       Q.    How do you know when a ramp exceeds the slope
24   requirements of the Americans with Disabilities Act
25   architectural guidelines?                             14:08
```

JAMES WILLEY SHAYLER

Page 34

```
1        A.    If I feel that it's over, then I take

2   measurements and -- I take measurements.  If it's over

3   two, then -- two to three inches, then I may take some

4   pictures.                                                    14:08

5        MR. SAHELIAN:  Madam Court Reporter, could you

6   please read my question and his answer.                      14:09

7            (The record was read as follows:

8            "How do you know when a ramp exceeds the           14:08

9            slope requirements of the Americans with

10           Disabilities Act architectural guidelines?         14:08

11           "Answer.  If I feel that it's over, then I

12           take measurements and -- I take measurements.

13           If it's over two, then -- two to three inches,

14           then I may take some pictures.")

15       Q.    BY MR. SAHELIAN:  All right.  So you said, "If    14:09

16  I feel that it's over," what does that mean, if you feel

17  that it's over?

18       A.    Well, if it's caused me frustrations or

19  anxiety and I can tell that it seems a little steep, then

20  I may take measurements.                                     14:09

21       Q.    Now would it be fair to say that you've filed

22  over 300 lawsuits?

23       MR. HASHEMI:  Objection, lacks foundation, leading.

24           Go ahead.

25       THE WITNESS:  I'm not sure how many I filed.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 35

 1       Q.    BY MR. SAHELIAN:  Would it be over 100?

 2       MR. HASHEMI:  Objection, asked and answered.

 3             Go ahead.

 4       THE WITNESS:  Yes.

 5       Q.    BY MR. SAHELIAN:  Would it be over 200?

 6       A.    I'm not sure.                                  14:10

 7       Q.    Who would know?

 8       MR. HASHEMI:  Calls for speculation.

 9             Go ahead.

10       THE WITNESS:  I guess my attorneys may know.

11       Q.    BY MR. SAHELIAN:  All right.  Who are your

12  attorneys?

13       A.    Mr. Manning, Joe Manning.

14       Q.    Do you have any other attorneys?             14:10

15       A.    No.

16       Q.    Currently as we're sitting here, do you have

17  any cases, ongoing cases with any attorneys other than

18  the Manning Law Firm?

19       A.    No.  Not that I'm aware of.

20       Q.    Have you ever employed any other attorneys    14:11

21  other than the Manning firm?

22       A.    Yes.

23       Q.    Name them.

24       A.    I'm not sure of their names.  I'm not sure of 14:11

25  the name on the law firm.

08/03/2022

JAMES WILLEY SHAYLER

Page 36

```
 1        Q.    Does the name Hakimi refresh your memory?

 2        A.    Yeah.  Yeah.  I believe that was -- that's

 3   them.

 4        Q.    Any others?

 5        A.    Not that I'm aware of, no.

 6        Q.    Do you currently have a case or more than one

 7   case with the Hakimi firm?  That's Hakimi & Shahriari?       14:12

 8        A.    I don't believe so.

 9        Q.    When was the last time you communicated with

10   them?

11        A.    Maybe three or four months ago.

12        Q.    You don't have to tell me the substance of the   14:12

13   communication but was it in reference to a case?

14        A.    Yes, it was.

15        Q.    Is that case terminated?

16   **   MR. HASHEMI:  Objection.  I'm going to instruct him

17   not to answer that question.  I think now we're getting

18   into the content and the description of the items that      14:13

19   were discussed.

20        MR. SAHELIAN:  Well, not really, Mr. Hashemi,

21   because if a case is terminated, then it's public

22   knowledge.  So he should know whether the case is

23   terminated or not.

24        MR. HASHEMI:  Well, but I respectfully disagree

25   because now you're asking about the content of that
```

JAMES WILLEY SHAYLER

1    discussion and --

2        MR. SAHELIAN:  Well --

3        MR. HASHEMI:  -- I have general questions that that

4    leads -- that could be construed as a waiver of attorney-

5    client privilege.  I apologize, but I'm going to have to        14:13

6    instruct him not to answer the question.

7        MR. SAHELIAN:  Well, first of all, it is not up to

8    you to invoke that waiver because you're not the

9    attorney.  You have no standing or no rights to invoke

10   that attorney-client privilege.

11           Number two, I'm not asking him anything that's

12   not public information.  So I'll rephrase it again.

13       Q.   BY MR. SAHELIAN:  Mr. Shayler, insofar as you

14   know, are all the cases that you might have had with any        14:14

15   attorney other than the Manning firm closed, terminated,

16   done with, call it what you want?

17       MR. HASHEMI:  Objection, compound, vague, and calls

18   for speculation.

19           Go ahead, Mr. Shayler.

20       THE WITNESS:  I believe so, yes.

21       Q.   BY MR. SAHELIAN:  And what makes you think          14:15

22   that?

23       MR. HASHEMI:  Same objections.

24       THE WITNESS:  Because they -- because they told me.

25       Q.   BY MR. SAHELIAN:  All right.  So let's take a

08/03/2022

JAMES WILLEY SHAYLER

Page 38

```
 1   five-minute break, Mr. Shayler, because like you, I do      14:15
 2   have physical limitations.  I sit in a wheelchair, so
 3   occasionally I need to stretch.  So five minutes,
 4   Mr. Hashemi?
 5        MR. HASHEMI:  By all means.
 6        MR. SAHELIAN:  Thank you.
 7        MR. HASHEMI:  Thank you.  Off record.
 8          (Recess.)                                             14:17
 9        MR. SAHELIAN:  All right.  We're going to speed
10   through the rest of the depo, Mr. Hashemi.  All right?
11   Back on the record.
12        MR. HASHEMI:  Yes.
13        Q.   BY MR. SAHELIAN:  All right.  I'm going to
14   have my assistant Audrey pull up Medical Report Number 1.   14:27
15   And, Madam Court Reporter, what does she have to do?
16   Just share her screen?
17        THE REPORTER:  Yes.
18        MR. SAHELIAN:  And click Number 1, Audrey.
19          Madam Court Reporter, do we email these to you
20   right now?  What's the proper way of doing this?
21        THE REPORTER:  Off the record?
22        MR. SAHELIAN:  Yes.
23          (Discussion off the record.)
24        Q.   BY MR. SAHELIAN:  All right, Mr. Shayler, can     14:28
25   you see this exhibit from the Beverly Hospital?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 39

```
 1       A.    Yes.

 2       Q.    We're going to mark this as Exhibit 2.

 3  Exhibit 1 is going to be the Notice of Deposition, which

 4  I believe our court reporter has received a copy.

 5            (Exhibits 1 and 2 were referenced.)

 6       Q.    BY MR. SAHELIAN:  Did anyone at the Beverly     14:29

 7  Hospital examine you?

 8       A.    Oh, yeah.

 9       MR. SAHELIAN:  All right.  I believe this one,

10  Audrey, if you would scroll all the way to see who the

11  physician is.  I can't quite tell, but this one looks as  14:29

12  if it was a report by Dr. Charles Ananian.

13       Q.    Do you know him?

14       A.    I don't know him, but I remember when he -- I

15  asked him to fill this out, yeah.  I don't know him.  I    14:30

16  remember this.

17       Q.    All right.  Explain to me the reason why you

18  went to see Dr. Ananian.

19       A.    I just had -- I had some issues with my back.   14:30

20       Q.    Do you see the date on the document?

21       A.    Yeah, 2/11 of 2020.

22       Q.    Okay.  So you went to see him because you were

23  having backaches?

24       A.    Back spasms and, yeah, I was having some

25  problems with my back, yeah.
```

JAMES WILLEY SHAYLER

Page 40

1      Q.    What did he tell you to do or not to do?                  14:31

2      A.    He told me that I had a pinched nerve my

3  L4/L5, and he said that that's what's causing the

4  neuropathy.  And he said that I should limit how long I

5  sit and stand, and he gave me some limitations.  And that  14:31

6  it could get worse.

7      Q.    What did he tell you about the use of a

8  wheelchair, if any?

9      A.    He didn't -- we never discussed using a

10  wheelchair.

11      Q.    What about the use of a walker or a cane?

12      A.    I believe I was using a walker then, but he       14:32

13  told me -- we didn't discuss any of that.  Just he

14  discussed my back and what was going on with it.

15      Q.    Did he tell you to avoid walking without a

16  walker?

17      A.    No, he did not say to avoid walking without a

18  walker.  I just -- he gave me some limitations and said

19  that I was going to have to be careful not to lift         14:32

20  anything too heavy I believe he said and stuff like that.

21      Q.    So with respect to the use of mobility aids

22  when walking, have you told me everything he told you?

23      MR. HASHEMI:  Objection, calls for speculation.

24  Compound.

25      THE WITNESS:  I'm not sure.

08/03/2022

JAMES WILLEY SHAYLER

Page 41

```
 1        MR. SAHELIAN:  That was a speaking objection,
 2  Mr. Hashemi.  You know how much I love you.  I don't want     14:33
 3  to get upset.
 4        MR. HASHEMI:  What part of it was speaking, counsel?
 5        MR. SAHELIAN:  Because calls for speculation is your
 6  signal for your client to say he doesn't remember.  Let's
 7  avoid that.
 8        MR. HASHEMI:  I don't -- I disagree with you if
 9  that's what you believe.  It does call for speculation
10  because you're asking him to tell you if he's told you
11  everything that was discussed between him and his doctor     14:33
12  on that day, and I wasn't there, so I would presume there
13  was more than a couple sentences exchanged, but let's
14  leave it at that.
15        Q.    BY MR. SAHELIAN:  All right.  Do you remember     14:34
16  Dr. Ananian telling you to limit your walking without       16:00
17  cane or a walker?
18        A.    No.
19        Q.    Did you tell Dr. Ananian that your knees
20  buckled and that you occasionally fell?
21        A.    I don't think I discussed my knees with him.    14:34
22  I --.  It was -- mostly it was my back.
23        MR. SAHELIAN:  All right.  We're going to mark this
24  as --.  Madam Court Reporter, are we marking it as
25  Exhibit B or Exhibit 2?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 42

1          THE REPORTER:  Exhibit 2.

2          MR. SAHELIAN:  All right.  So we're marking this as

3     Exhibit 2.  Let's move to Exhibit 3.                         14:35

4              (Exhibit 3 was referenced.)

5          Q.    BY MR. SAHELIAN:  All right.  What we have

6     here, Mr. Shayler, is a report from a Dr. John P-L-U-T.

7     I don't know how to pronounce his last name.  And it's

8     titled orthopedic follow-up, and I'm going to have my      14:35

9     assistant scroll down to the bottom.  There is no

10    signature and insofar as I can tell, there is no date on

11    this.  Unless I'm wrong.  Did you go see Dr. Plut?

12         A.    I think it was Hopper, Dr. Hopper.

13         MR. SAHELIAN:  All right.  Audrey, would you scroll

14    all the way up?  Yes, okay.                                 14:36

15         THE WITNESS:  Oh, yes.  Yeah, Dr. Plut, yeah.

16    Dr. Douglas referred me to him.

17         Q.    BY MR. SAHELIAN:  All right.  What did you go

18    see Dr. Plut for?

19         A.    I -- I don't remember.

20         Q.    All right.  What did he tell you to do or not

21    to do?

22         A.    I don't remember what we talked about.  That    14:36

23    was, you know, quite a long time ago, five or six -- a

24    long time ago, five or six years ago, I'm not sure.

25         MR. SAHELIAN:  All right.  We're marking this as

08/03/2022

JAMES WILLEY SHAYLER

Page 43

1     Exhibit 3 if I'm correct.  Let's move to Exhibit 4.

2              (Exhibit 4 was referenced.)

3        Q.    BY MR. SAHELIAN:  Do you recall seeing a          14:36

4    Dr. McCloy?

5        A.    Yeah.

6        Q.    Let's scroll --

7        A.    That is correct.

8        Q.    Let's scroll down and see if there's a date on

9    this document.  All right.  Doesn't seem to be a date at

10   the bottom.

11       A.    Yeah, it was -- yeah, there is a date.          14:37

12       Q.    There's a date up top of January 15, 2020.

13       A.    Yes.

14       Q.    Right?  What did you see Dr. McCloy for?

15       A.    My primary care doctor.

16       Q.    Did he tell you what to do or not to do

17   relative to walking?

18       MR. HASHEMI:  Objection, vague.

19       THE WITNESS:  He -- he just -- we were -- I think     14:37

20   what we were discussing is the pain that, um, I was

21   experiencing and gave me medication for it.

22       Q.    BY MR. SAHELIAN:  Did you tell him about your

23   knees buckling?

24       A.    I may have, I'm not sure.

25       Q.    Did he leave you with recommendations?

08/03/2022

JAMES WILLEY SHAYLER

Page 44

```
 1        A.    Just to take Hydrocodone twice, I believe, you    14:38

 2   know?  I'm not sure.  I believe I did tell him that my

 3   knees were buckling or would just -- would give out.        14:38

 4        Q.    What is Hydrocodone?  Is that a painkiller?

 5        A.    Ox -- it oxycodone, yes.  Hydrocodone and

 6   oxycodone are both pain relievers, yeah.

 7        Q.    And did you follow his recommendation and

 8   administer yourself with the medication?

 9        A.    Yeah.  Uh-huh.

10        Q.    How long did you take it?

11        A.    Off and on for about four years.              14:39

12        MR. SAHELIAN:  All right.  And so we're marking this

13   as Exhibit 4 if I'm correct.  Let's move to the next.

14   All right.  We are back with Dr. McCloy, and this looks

15   like a visit on March 2nd, 2020.  We're marking this as    14:39

16   Exhibit 5, if I'm correct.

17             (Exhibit 5 was referenced.)

18        Q.    BY MR. SAHELIAN:  Do you recall your visit?

19        A.    Yeah.

20        Q.    What did you see Dr. McCloy for in March of

21   2020?

22        A.    Just one of my many visits to him, and he -- I    14:40

23   had an infection in my foot.

24        Q.    All right.  And did he tell you what to do or

25   not to do as a result of this visit?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 45

```
 1       A.    To always wear slippers and don't walk around        14:40

 2    barefooted.

 3       Q.    Did you tell him you were using a walker or a

 4    cane?

 5       A.    I believe so.

 6       Q.    Did you walk into his office with a walker or

 7    a cane?

 8       A.    I believe so.

 9       Q.    Which?                                                14:41

10       A.    One of the two.  I don't remember on this

11    visit which I used.  I think I used a walker.

12       Q.    Did you tell him that you're unable to walk on

13    rough terrain?

14       A.    Yes.

15       Q.    Did you tell him you were unable to walk on

16    slopes?                                                        14:41

17       A.    He told me to try to avoid slopes.

18       Q.    Did he tell you to try and avoid rough

19    terrain?

20       A.    Yes.

21       Q.    And so did you follow his advice?                    14:42

22       A.    I tried -- yes, I have.

23       Q.    So as a result of his advice in March of 2020,

24    you avoid slopes and you avoid rough terrain; is that

25    correct?
```

JAMES WILLEY SHAYLER

Page 46

```
 1      A.    Yes.

 2      Q.    And as a result of his advice, you do not use

 3  steps; is that correct?

 4      MR. HASHEMI:  Objection, argumentative.

 5           Go ahead.

 6      THE WITNESS:  No, I just avoid steps since I fell.

 7  That's the reason I avoid steps.

 8      Q.    BY MR. SAHELIAN:  What did he tell you

 9  relative to steps?

10      A.    He didn't say anything regarding the steps.

11      MR. SAHELIAN:  All right.  Let's move to Exhibit 6.

12  That's another visit with Dr. McCloy in April of 2020.   14:43

13           (Exhibit 6 was referenced.)

14      Q.    BY MR. SAHELIAN:  That's about a month later,

15  and it says you had a deep hole in your right heel; is

16  that correct?

17      A.    Yes.

18      Q.    And how did you have your heel treated?        14:43

19      A.    From a podiatrist.

20      Q.    Okay.  What did they have to do to make sure

21  your heel was cured?

22      A.    I think they filed down a callous, and -- and

23  that was it.  There was no sore underneath it.           14:44

24      Q.    How long did it take to cure your heel?

25      A.    Quite a long time.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 47

```
 1        Q.    And did you walk on it in the meantime?

 2        A.    While this was happening, I tried not to walk

 3   on my -- my bottom of my feet.  Tried to stay off them.     14:44

 4        Q.    But you still walked on it; correct?

 5        A.    Yes.

 6        Q.    All right.  Let's move to Exhibit 7.  That's

 7   another visit to Dr. McCloy in May of 2020.

 8              (Exhibit 7 was referenced.)

 9        Q.    BY MR. SAHELIAN:  All right, for it says

10   osteomyelitis.  Describe what that is for us, please.        14:45

11        A.    That's when -- that's when you have an

12   infectious disease in -- in your foot.  And they gave me

13   antibiotics.                                                 14:46

14        Q.    Did that go away?  Was it cured?

15        A.    Almost lost --.  Yeah, it got cured.  Almost

16   lost my leg.

17        MR. SAHELIAN:  All right, let's go to Exhibit 8.

18              (Exhibit 8 was referenced.)

19        Q.    BY MR. SAHELIAN:  All right.  You went to

20   Dr. Su, that's S-U, for a foot infection it says.           14:46

21        A.    Uh-huh.

22        Q.    And so why did you go to another doctor here

23   instead of your last doctor?

24        A.    Because he was trying to prevent me to having

25   to amputate my leg.                                         14:46
```

08/03/2022

JAMES WILLEY SHAYLER

Page 48

```
 1        Q.    Did Dr. McCloy refer you to Dr. Su?

 2        A.    Yes, he did.

 3        Q.    And what did Dr. Su recommend in terms of

 4   treatment to prevent your leg from being amputated?      14:47

 5        A.    I went -- I went to a -- an amputation prevent

 6   center in Beverly Hospital.  And then I saw Dr. Su a few

 7   times.

 8        Q.    Now in the meantime, were you able to walk on   14:47

 9   your foot?

10        A.    At that time I -- um, I was trying to stay off

11   my right foot.

12        Q.    What if you had to get out and walk and shop

13   and (simultaneous dialog)?

14        A.    If I had to do it, then I had to do it, but I

15   was trying to stay off that foot.

16        Q.    And were you using a mobility device to help    14:48

17   you?

18        A.    Yes.

19        Q.    All right.  Let's go to Exhibit 9.

20              (Exhibit 9 was referenced.)

21        Q.    BY MR. SAHELIAN:  This looks like you're back

22   with Dr. McCloy here, and it looks as if you went to see

23   him in July, and he's noting down progress.

24        A.    Uh-huh.                                          14:48

25        Q.    And he says you're in a walking boot.  And the
```

08/03/2022

JAMES WILLEY SHAYLER

Page 49

```
 1    hole in your heel has almost sealed over.  That's pretty
 2    good news; correct?
 3        A.    Yeah.
 4        Q.    And did your walking improve after that?
 5        MR. HASHEMI:  Objection, vague.
 6        Q.    BY MR. SAHELIAN:  All right.  Were you able to
 7    walk easier after the -- your infection healed?            14:49
 8        A.    Yeah, I guess I was able to walk a little bit
 9    better, yeah.
10        Q.    All right.  At this time in July of 2020, did
11    you have issues with your knees buckling?
12        A.    Yes.
13        Q.    Is there anywhere on any of these medical
14    reports an indication that you communicated that to any
15    of these physicians so far?                                14:49
16        A.    I don't know if I did or did not.  I'm just
17    not sure.
18        Q.    Would that have been important to you at the
19    time?
20        A.    I don't think I was falling at that time but,
21    yes, it would have been, yeah.
22        Q.    All right.  Let's move to Exhibit 10.           14:50
23              (Exhibit 10 was referenced.)
24        Q.    BY MR. SAHELIAN:  We're back with Dr. McCloy,
25    and he says your heel is almost healed, and this is in
```

08/03/2022

JAMES WILLEY SHAYLER

Page 50

```
 1   September of 2020.  And he also indicates you've been
 2   visiting Beverly Hospital.
 3        A.    Uh-huh.
 4        Q.    Where is Beverly Hospital located?          14:50
 5        A.    In Montebello.
 6        Q.    All right.  That's quite a drive for you from
 7   Culver City; correct?
 8        A.    Yes.
 9        Q.    Why did you go all the way over there?
10        A.    Because they have a wound care center.  They
11   have a great wound care center.                         14:51
12        Q.    All right.  And it seems as if they actually
13   helped you cure your wound; is that correct?
14        A.    Yeah.  Yes.
15        Q.    You're happy with the work they did?
16        A.    Yes.
17        Q.    It was worth --?  Was it worth the drive all  14:51
18   the way over there?
19        A.    Yeah, it was a long drive.  Yeah.
20        Q.    All right.  While you were out there in
21   Montebello, did you happen to stop at any businesses and
22   find ADA violations?
23        MR. HASHEMI:  Objection, leading, argumentative,
24   lacks foundation.
25             Go ahead, Mr. Shayler.                        14:52
```

08/03/2022

JAMES WILLEY SHAYLER

Page 51

```
 1          THE WITNESS:  I'm not sure if I did or did not.  I

 2    may have.

 3          Q.    BY MR. SAHELIAN:  Would there have been any

 4    businesses nearby, nearby say the Beverly Hospital that

 5    you sued?

 6          MR. HASHEMI:  Objection, calls for speculation.

 7          THE WITNESS:  There may have.  I'm not sure.  There

 8    may have been.

 9          Q.    BY MR. SAHELIAN:  I'm going to give you a

10    moment to see if you can think of one or more.  Take your      14:53

11    time.

12          A.    Uh-huh.  I can think of one.

13          Q.    All right.  Go ahead.

14          A.    It was a market.  I believe a market that I

15    went to.

16          Q.    Do you remember the name?

17          A.    No.

18          Q.    How far from the hospital was it?

19          A.    Two blocks.

20          Q.    All right.  And did you used to go to that         14:53

21    market?

22          A.    Yes.

23          Q.    And did you sue them?

24          A.    Believe one of the lawyers filed a Complaint

25    on it, yes.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 52

1       Q.    Can you tell me what the status is on that

2   case?

3       A.    I couldn't tell you.  I -- I couldn't tell you      14:53

4   the status.  I believe they settled, I'm not sure.  I --

5   I'm not sure.

6       Q.    Can you describe the parking area of that

7   market for me?

8       A.    I could not.  I could not.

9       Q.    When was the last time you were there?

10      A.    I'm just not sure what last time I was there.

11  Been recent.  Couple years.                               14:54

12      Q.    Do you have any reason to go back there?

13      A.    Not unless I go to the wound care center, no.

14      Q.    Is there any reason for you to go back to the

15  wound center?

16      A.    Yes.

17      Q.    Do you have an appointment?                      14:54

18      A.    No.

19      Q.    When do you plan to go back there?

20      A.    I'm not.

21      Q.    As we sit here, you have no plans to go back

22  to the wound center; is that correct?

23      A.    That's correct.

24      Q.    And as we sit here, you have no reason to go     14:55

25  back to the Beverly Hospital; is that correct?

08/03/2022

JAMES WILLEY SHAYLER

Page 53

 1        A.    That -- I'm not sure.  If I -- if there's any

 2   reason for me to go back to the Beverly Hospital, I'm not

 3   sure.

 4        Q.    Do you know of any reason at this point for

 5   you to have to go back to the Beverly Hospital in

 6   Montebello?                                                    14:55

 7        A.    No.

 8        Q.    Would there be any reason for you to go back

 9   to the market that's near the Beverly Hospital in

10   Montebello?

11        A.    If I was going to the Beverly Center, I might

12   stop by that market.

13        Q.    The Beverly Center or Beverly Hospital?           14:56

14        A.    Hospital and the wound care center, yes.

15        Q.    What would be the reason for you to go back to

16   the market?

17        A.    Maybe to get something to eat or drink

18   something.

19        Q.    When you sued them, do you recall if you

20   actually had gone inside or not?

21        MR. HASHEMI:  Objection, vague.                          14:56

22        THE WITNESS:  Yes, I went inside.

23        Q.    BY MR. SAHELIAN:  Do you recall what you

24   bought?

25        A.    No.  I don't recall what I bought.

08/03/2022

JAMES WILLEY SHAYLER

Page 54

1      Q.    Do you recall how many times you went to that

2   market?

3      A.    No, I don't.

4      Q.    If I give you an address, would you be able to

5   tell me if that's the actual address of the market?          14:57

6      A.    Nope.

7      Q.    How would you know how to get there?

8      A.    It's two blocks from the hospital.  On the

9   same street.                                                  14:57

10     Q.    All right.  Is it on Poplar Avenue in

11  Montebello?

12     A.    I'm not sure.

13     Q.    P-O-P-L-A-R?

14     A.    I'm not sure.

15     Q.    Do you recall if there was an icebox next to

16  where the accessible parking space was?                      14:58

17     A.    Again I'm -- I'm not sure.

18     Q.    Can you tell me how many entrances the market

19  had?

20     A.    Yes.

21     Q.    How many?

22     A.    One en -- one entrance.

23     MR. HASHEMI:  Could we take a break after you're

24  done with this line of questioning, Mr. Sahelian?            14:59

25     MR. SAHELIAN:  Of course.  All right.  I want to

08/03/2022

JAMES WILLEY SHAYLER

Page 55

 1    mark what we have as Exhibit Number 10.

 2            And, Mr. Hashemi, you may have all the break

 3    your heart desires.

 4        MR. HASHEMI:  Well, you're very kind and gracious.

 5    It shouldn't be more than --

 6        MR. SAHELIAN:  Thank you.

 7        MR. HASHEMI:  Thank you.                        14:59

 8            (Recess.)

 9        Q.   BY MR. SAHELIAN:  There we go.  I believe

10    we --.  Oop, back on the record.  I believe we were on    14:59

11    Exhibit 10.  Exhibit 11.                                   15:07

12            (Exhibit 11 was referenced.)

13        Q.   BY MR. SAHELIAN:  All right, Mr. Shayler, you

14    were back to visit Dr. McCloy, I believe, in September of

15    2020.  And once again he says your heel is almost healed.

16    Any progress here in September?                            15:07

17        A.   No, they just started to do skin grafts.

18        Q.   How did you walk on your leg with fresh skin

19    grafts?

20        A.   I had that boot.  I kept -- tried to keep the    15:08

21    pressure off that area.

22        Q.   And you were on du-lo-cell -- duloxetine, I'll

23    spell it, D-U-L-O-X-E-T-I-N-E, and Norco, N-O-R-C-O.

24    What are those?

25        A.   One's a nerve pain pill, and the other's a

JAMES WILLEY SHAYLER

Page 56

| | | |
|---|---|---|
| 1 | Hydrocodone, 10 milligrams. | 15:08 |
| 2 | Q.    All right.  Did you tell Dr. McCloy at the | |
| 3 | time that you were having trouble walking? | |
| 4 | A.    I'm not sure what we talked about.  Obviously | |
| 5 | it was regarding the -- um, my wound on the bottom of -- | |
| 6 | on my heel. | 15:09 |
| 7 | Q.    Were you walking at the time? | |
| 8 | A.    As little as I could. | |
| 9 | Q.    Did you walk into his office? | |
| 10 | A.    Yes. | |
| 11 | Q.    Were you using a walker? | |
| 12 | A.    Believe I was. | |
| 13 | Q.    Would there be any reason for you not to use a | 15:09 |
| 14 | walker at the time? | |
| 15 | A.    I'm not sure.  I may have used the cane but, | |
| 16 | no, I believe I was using a walker then. | |
| 17 | Q.    And did you need to visit him repeatedly to | |
| 18 | get your medication, pain medication renewed? | |
| 19 | A.    Yeah, and then the wound on my foot, he wanted | 15:10 |
| 20 | to make sure it was healing. | |
| 21 | Q.    And did you in parallel continue to visit the | |
| 22 | Beverly Hospital? | |
| 23 | A.    Yes, I did. | |
| 24 | Q.    How often would you visit the Beverly Hospital | |
| 25 | at the time? | |

08/03/2022

JAMES WILLEY SHAYLER

Page 57

```
 1      A.    Every couple weeks.

 2      Q.    Did you at the time discuss your knee-buckling

 3   issues with anyone at the Beverly Hospital?                    15:10

 4      A.    I'm not sure.  I talked to my -- I talked to

 5   the surgeon about it.

 6      Q.    This is the surgeon that performed the skin          15:11

 7   graft?

 8      A.    No, the surgeon that did the knee replacement.

 9      Q.    All right.  When did you have your knees

10   replaced?

11      A.    Seven years ago.

12      Q.    What hospital?

13      A.    At Beverly Hospital.

14      Q.    When was the last time you saw a physician

15   regarding your knee replacement?                              15:11

16      A.    I couldn't tell you.

17      Q.    Was it over a year ago?

18      A.    Oh, yes.

19      Q.    Was it over two years ago?

20      A.    Yes.

21      MR. SAHELIAN:  All right, let's move on to Exhibit

22   12.  We were going to mark this as Exhibit 11, so now         15:12

23   we're at Exhibit 12.

24            (Exhibit 12 was referenced.)

25      Q.    BY MR. SAHELIAN:  All right, you went to
```

JAMES WILLEY SHAYLER

Page 58

```
 1   Dr. Parham Yashar.  And it says he is a surgeon.  Did you
 2   have him operate on you?
 3       A.    No, he didn't do surgery.  He said I needed        15:12
 4   surgery.
 5       Q.    All right.  This is in November of 2019.  What
 6   was the purpose of --?  No, I take that back.  This was
 7   in September of 2020, my apologies.  So what did you see
 8   Dr. Yashar for?
 9       A.    The pinched sciatic nerve.
10       Q.    Weren't you being treated by Dr. McCloy for      15:13
11   that?
12       MR. HASHEMI:  Objection, lacks foundation,
13   argumentative.  Assumes facts not in evidence.
14           Go ahead, Mr. Shayler.
15       THE WITNESS:  Dr. McCloy is just a primary care
16   doctor.  I think he re -- referred me to someone that did
17   surgery.                                                   15:13
18       Q.    BY MR. SAHELIAN:  All right.  Was he the one
19   that referred you to Dr. Yashar?
20       A.    I believe so.
21       Q.    All right.  So what did you tell Dr. Yashar
22   was your problem?
23       A.    I believe we looked at an MRI of -- of my
24   spine and told me that there was a certain surgery that
25   he could do to relieve the pressure on that pinched
```

JAMES WILLEY SHAYLER

Page 59

1   sciatic nerve.

2        Q.    Did you tell him about your knees buckling?        15:14

3        A.    No, I was -- I just talked to him about the

4   pain running down my left leg and buttocks.

5        Q.    Did you tell him you were having trouble

6   walking on rough terrain?

7        A.    No.

8        Q.    Did you tell him you were having trouble        15:14

9   walking on slopes?

10        A.    I only talked to him about my pinched sciatic

11   nerve.

12        Q.    So at the conclusion of your visit, what did

13   he recommend that you do?

14        A.    I asked him if the surgery would relieve the

15   pressure, and he said he couldn't guaranty that it would.        15:15

16   And so I -- I opt out of doing the surgery.

17        Q.    But he did guaranty you that he would take

18   your money; right?

19        MR. HASHEMI:  Objection, lacks foundation.

20        Q.    BY MR. SAHELIAN:  All right.  That was a joke.

21   Mr. Shayler, occasionally I'll throw in a joke here and

22   there.

23        A.    Yeah.

24        Q.    So you'll have to excuse me.  It's the only        15:15

25   way I can stay sane.

08/03/2022

JAMES WILLEY SHAYLER

Page 60

1      A.    Yeah.  Yeah, he guaranteed that he would

2   charge me for the surgery.

3      Q.    All right.  Let's mark this as Exhibit 12 and

4   move to Exhibit 13.

5            (Exhibit 13 was referenced.)

6      Q.    BY MR. SAHELIAN:  All right.  Seems as if you

7   returned to visit Dr. Yashar.  And it says your neck was

8   stiff, and you continue to have low back pain.  All        15:16

9   right?

10     A.    Yeah.

11     Q.    What was the conclusion of that visit?

12     A.    I think that was the last visit I saw him.  I

13  think, you know, he stated that he could do the surgery,

14  but he couldn't guaranty that it would work, and he left

15  it up to me.

16     Q.    All right.  And where was his office located?   15:16

17     A.    I think over there in the Beverly Hills area

18  somewhere.  Maybe off Sunset or some --.  I'm not sure.

19  Beverly Hills area somewhere.

20     Q.    Did he prescribe any medication?

21     A.    I don't believe so.

22     MR. SAHELIAN:  All right.  So we're going to mark

23  this as Exhibit 13 and move to 14.                          15:17

24            (Exhibit 14 was referenced.)

25     Q.    BY MR. SAHELIAN:  It looks like a visit that

08/03/2022

JAMES WILLEY SHAYLER

Page 61

1    took place in December of 2020.  Again it's stiff neck

2    and low back pain.  Anything different here, Mr. Shayler?    15:17

3        A.    No.

4        Q.    All right.  Just a follow-up visit?

5        A.    I believe so.

6        MR. SAHELIAN:  Let's mark this as Exhibit 14 and

7    move to Exhibit 15.

8             (Exhibit 15 was referenced.)

9        MR. SAHELIAN:  All right.  Now this one is an

10   orthopedic independent medical examination and report by

11   Dr. Mir, M-I-R.  We're going to mark it as Exhibit 15, am    15:18

12   I correct?

13       THE REPORTER:  Yes.

14       Q.    BY MR. SAHELIAN:  And it is dated October of

15   2021.  Have you seen this medical examination,

16   Mr. Shayler?  Report.                                         15:18

17       A.    No, I -- I -- I believe I have, but it's been

18   a long time.  I don't recall.  I may have seen it.

19       Q.    Do you recall speaking with Dr. Mir?

20       A.    Yes.

21       Q.    Do you have any recollection as to what you       15:19

22   told him about your physical ailments?

23       A.    No.  Huh-uh.  Don't recall.

24       Q.    Do you recall anything with respect to your

25   visit to Dr. Mir?

JAMES WILLEY SHAYLER

Page 62

1      A.    No, I don't recall much of the visit.  I just

2  remember he had some questions.                              15:19

3      Q.    You'll have to excuse me, it was a bit noisy

4  out here.  Let me ask you again.  Do you have any

5  recollection of -- any recollection at all of your visit

6  with Dr. Mir?                                                15:20

7      A.    I just remember him asking me some questions,

8  and I tried to answer them as truth -- truthfully as I

9  could.

10     Q.    Did he make you walk and observe you?

11     A.    Yes.

12     Q.    Did you tell him you were having knee buckling

13  problems?

14     A.    I -- I don't remember if I did tell him that.    15:20

15     Q.    Did you tell him you were having difficulty

16  walking on rough terrain?

17     A.    Again I'm not sure if I did tell him that.

18     Q.    Did you tell him you were having difficulty

19  walking on slopes?

20     A.    Again I'm not sure if I did mention that.        15:21

21     Q.    What was your understanding of why you were

22  going to see Dr. Mir?

23     A.    He was doing evaluation of me.

24     Q.    All right.  Aside from making you walk, what

25  else did he make you do, if anything?

JAMES WILLEY SHAYLER

Page 63

```
 1      A.    Bend and touch the ground and -- and checked      15:22
 2   my legs out, stuff like that.
 3      MR. SAHELIAN:  All right.  And we're going to mark
 4   this as Exhibit 15 and move on to the next.  All right,   15:22
 5   it looks like Exhibit 16 is a picture of your handicap
 6   parking placard.
 7           (Exhibit 16 was referenced.)
 8      MR. SAHELIAN:  Which I hope your attorney,
 9   Mr. Hashemi, will not take a copy of and use it for his
10   regular trips to restaurants.
11      MR. HASHEMI:  All right.  I will not.  I will not do   15:22
12   that.  It's valet where I go.
13      MR. SAHELIAN:  You promise, counsel, you promise?
14      MR. HASHEMI:  I promise.  The valets do.  I don't
15   need it.
16      MR. SAHELIAN:  Okay.  Good.
17      MR. HASHEMI:  It's not necessary for me.
18      MR. SAHELIAN:  Good.  I feel much better.
19      Q.    So, Mr. Shayler, do you know which doctor gave
20   you a prescription for this, for this handicap placard?    15:23
21      A.    Dr. McCloy.
22      Q.    All right.  And why did he -- strike that.
23   Did he make it possible for you to get this on the basis
24   of something you told him?
25      MR. HASHEMI:  Objection, calls for speculation.
```

JAMES WILLEY SHAYLER

1          Go ahead.

2      THE WITNESS:  Well, he saw that I was using a          15:23

3  walker.  And I needed assistance to walk.

4      Q.   BY MR. SAHELIAN:  Well, did you ask him to

5  give you a --?  Strike that.

6          Did you ask him to make it possible for you to

7  get a handicap placard?

8      MR. HASHEMI:  Objection, vague.

9      THE WITNESS:  I -- I didn't ask him.  I just let him     15:24

10 know that I was having problems of getting to stores and

11 stuff, and I brought that form with me and left it with

12 him.

13     Q.   BY MR. SAHELIAN:  Oh, I see.  Where did you

14 get the form?

15     A.   At DMV.

16     Q.   I see.  So you asked him to fill out the form

17 so you could get a handicap placard?          15:24

18     A.   Yes.

19     Q.   When was that?

20     A.   Probably in 2020.

21     Q.   Was it during one of your visits or outside of

22 one of your visits?

23     A.   No, it was one of my visits to see him.          15:25

24     Q.   All right.  Did you tell him you're having

25 difficulty walking across a parking lot?

JAMES WILLEY SHAYLER

Page 65

```
 1       A.    Yeah, I think it was in 2019 that I brought

 2  the forms to him.  And, yes, I told him it -- walking a

 3  long ways was hard.

 4       Q.    And at the time in your mind, what was a long

 5  way?

 6       A.    Anything over ten car lengths or so, you know,   15:25

 7  from the store, I was having problems, you know, walking.

 8  That's when I was -- my feet were -- were infected.

 9       Q.    Did you say "anything over ten car lengths"?

10       A.    Yeah, I told him I need to park closer to        15:26

11  the -- to the -- wherever I'm going, I need to park

12  closer.

13       Q.    And you said that was while you were having

14  your open sore treated; correct?

15       A.    Yeah.  Yes, after the surgery on the knee

16  replacement, yes.

17       Q.    So that the purpose for getting your handicap

18  placard was to prevent you from having to walk longer      15:26

19  distances because you were having your open sore treated;

20  correct?

21       MR. HASHEMI:  Objection, leading and argumentative,

22  lacks foundation.

23            Go ahead, Mr. Shayler.

24       THE WITNESS:  That was one of the reasons.

25       Q.    BY MR. SAHELIAN:  All right.  And what was
```

08/03/2022

JAMES WILLEY SHAYLER

Page 66

```
 1   another reason?
 2        A.    That I needed to -- because of my knees were
 3   so painful, I wanted to try to walk as least as I could.      15:27
 4        Q.    And when did you say you had your knees done?
 5        A.    I'm not sure exactly when I had my knees done.
 6        Q.    I believe you mentioned about six or seven
 7   years ago.  Is that -- is that a ballpark?                    15:27
 8        A.    Yeah, ballpark figure, something like that.
 9   2016 maybe.
10        Q.    All right.
11        A.    I'm not sure.
12        Q.    When was the first time you used the handicap
13   placard?
14        A.    After it was delivered to me in the mail.
15        Q.    Roughly what year was that?
16        A.    2019.
17        Q.    When did you begin experiencing pain in your
18   knees after your surgery?
19        A.    Right after the surgery, I experienced pain.      15:28
20        Q.    All right.  But you waited a number of years
21   before you got the placard?
22        A.    No, I got it -- yeah, I waited a year or two
23   before I got the placard, yeah.
24        Q.    So when was the last time you visited the
25   surgeon that performed your knee replacement?                15:28
```

08/03/2022

JAMES WILLEY SHAYLER

Page 67

```
 1      A.    Couple years after the surgery.

 2      Q.    Have you since told him you're having

 3  difficulty with your knees?

 4      A.    I told him that.

 5      Q.    When?

 6      A.    Couple years after the surgery, I told him I

 7  was having difficulty with my knees.                      15:29

 8      Q.    So that was, what, around 2017, 2018?

 9      A.    2017, 2018, yeah.

10      Q.    And what did he tell you in response, if

11  anything?

12      A.    He said, "When you came to see me, you were

13  using a walker.  And now you can walk.  You may be

14  limping and -- and having problems, but you can walk."   15:29

15  And I -- so he said, you know, "To me that's a success."

16      Q.    So essentially if I understand, the position

17  he's taking is that you need to put up with a little bit

18  of pain; is that correct?  Is that his position?

19      A.    Yes.  Yes.

20      Q.    Was his attitude, "Be a big boy and take it"?   15:30

21      A.    Something like that.  He didn't really care,

22  to be honest with you.

23      Q.    All right.  Did he ask you to continue using

24  your artificial knees so you can stay in shape?           15:30

25      MR. HASHEMI:  Objection, vague.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 68

```
 1          THE WITNESS:  Yes.
 2          Q.    BY MR. SAHELIAN:  So is that part of --?
 3   Strike that.  Is that your understanding, that part of
 4   having artificial knees is to have to continue using
 5   them?
 6          A.    Yes, that's correct.
 7          Q.    Otherwise they rust and you have to use 3-in-1   15:31
 8   Oil and get it lubricated?
 9          A.    Yeah, they get stiff.  And, yeah, you got to
10   keep moving them.
11          Q.    All right.  That was a joke, of course.  You
12   got that.
13          All right.  So if you don't keep moving your
14   artificial knees, they -- what happens?  They stiffen up?
15          A.    Yeah, they stiffen up.
16          Q.    And are you having to also use maybe a          15:31
17   stationary bike to keep your knees in motion?
18          MR. HASHEMI:  Lacks foundation.
19          THE WITNESS:  Yes, I -- I do use a bike, a bike at
20   our gym, yeah.
21          Q.    BY MR. SAHELIAN:  So that that helps you keep
22   it, for the lack of a better word, lubricated; is that    15:32
23   correct?
24          A.    Yes.
25          Q.    So when you use a handicap spot, when you go
```

JAMES WILLEY SHAYLER

1    anywhere, which direction do you park?  Do you park head-

2    on or do you park backwards?

3         A.    No, head-on.

4         Q.    All right.  And aren't you concerned that

5    somebody might park right next to you and you won't be

6    able to open the door wide enough?                          15:32

7         MR. HASHEMI:  Objection, vague.

8         THE WITNESS:  No, I'm not worried about that.  I --

9    I can usually get in and out without a problem.

10        Q.    BY MR. SAHELIAN:  All right.  And when you

11   take your cane with you, where do you put it in the car?

12        A.    Right to -- would be on the -- on the seat      15:33

13   next to me.

14        Q.    All right.  Now when you leave the car, do you

15   take your cane with you?

16        A.    Or the walker.

17        Q.    All right.  So when you're exiting the

18   driver's seat, do you reach over and grab the cane and

19   pull it towards you and --                                  15:33

20        A.    Yeah, if that's what I'm going to use, just

21   the cane, then that's what I would do, right.

22        Q.    All right.  So you put the cane right in the

23   passenger seat area, and then when you're exiting the

24   driver's seat, you reach over and you grab your cane and

25   close the driver's door; am I correct?                      15:34

08/03/2022

JAMES WILLEY SHAYLER

Page 70

```
 1        A.    Yes.  I put the cane down first to steady me,
 2   and then I get out of the driver's and, yeah.  If I'm
 3   going to use the walker, then I use the cane just to get
 4   back there, and then I'll grab the walker.
 5        Q.    So --
 6        A.    Because the walker's in the back of the car.
 7        Q.    So by the time you close the driver's side
 8   door, you already have your cane with you; correct?        15:34
 9        A.    Oh, yeah.
10        Q.    All right.  And that way you can use the cane
11   to walk to the back of the car and pull out your walker
12   if that's what you need to do; correct?
13        A.    Yes.  Uh-huh.
14        Q.    And I notice you drive an SUV; is that
15   correct?
16        A.    Yes.
17        Q.    And what is the make and model?              15:35
18        A.    It's a Nissan Rogue.
19        Q.    When have you --?  Strike that.  How long have
20   you driven that?
21        A.    Off and on for the last four years:  Or
22   last -- I had a Volkswagen before that.
23        Q.    How long ago was that?                      15:36
24        A.    Oh, I don't know.  I turned it in last year.
25   So I just started this Nissan Rogue.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 71

```
 1        Q.    So you've driven the Nissan for about a year

 2   now; right?

 3        A.    Right.  Before that, I had that -- a red --

 4   orange Volkswagen Tiguan.  SUV.

 5        Q.    Would you spell that model name?

 6        A.    I couldn't tell you how to spell the Tiguan.      15:36

 7   T-I-G-U-E maybe?

 8        Q.    All right, I think it's maybe T-I-G-U-A-N, but

 9   I could be wrong, and I'm not going to ask Mr. Hashemi

10   because he only drives Rolls-Royces, so he wouldn't know.   15:36

11        MR. HASHEMI:  Counsel, you're misleading the record

12   here.  I don't drive Rolls-Royces.  I'm chauffeured in

13   Rolls-Royces.

14        MR. SAHELIAN:  There you go.  There you go.  I knew

15   there was a reason I didn't ask you.

16             (Laughter.)

17        MR. HASHEMI:  That could all be true.  That would be

18   wonderful.

19        MR. SAHELIAN:  Okay.  I'm going to ask my assistant

20   to go to the Pico case exhibits.                            15:37

21        MR. HASHEMI:  How we doing on time?

22        MR. SAHELIAN:  I'll get you out before 5:00 p.m.,

23   Mr. Hashemi.  You don't have to worry.

24        MR. HASHEMI:  I'm not concerned about that.  You

25   take your time, Mr. Sahelian.  I was just going to ask if  15:37
```

08/03/2022

JAMES WILLEY SHAYLER

Page 72

1    we can take five minutes.  I need to refill my water.

2         MR. SAHELIAN:  Absolutely.  We'll take five minutes.

3         MR. HASHEMI:  Thank you.

4              (Recess.)

5         Q.   BY MR. SAHELIAN:  All right, Mr. Shayler,

6    let's see if we can get you home by five o'clock.  All          15:38

7    right.  So let's go to the first Exhibit 1.  So is this         15:49

8    orange car your Volkswagen that you had?

9         A.   Yes.

10        MR. SAHELIAN:  All right.  We're going to mark this

11   as Exhibit 17.

12             (Exhibit 17 was referenced.)

13        Q.   BY MR. SAHELIAN:  Are you holding a level?  I

14   should --.  That's you in the photograph; correct,

15   Mr. Shayler?                                                    15:49

16        A.   Yes.

17        Q.   All right.  And you're holding a phone in your

18   left hand; correct?

19        A.   Yes.

20        Q.   And a level gauge with your right hand;

21   correct?

22        A.   Yes.

23        MR. SAHELIAN:  All right.  That's Exhibit 17.  So we

24   marked the last one as 17; correct?

25             THE REPORTER:  Yes.                                   15:50

JAMES WILLEY SHAYLER

```
 1          MR. SAHELIAN:  Okay.  So this one's 18.

 2              (Exhibit 18 was referenced.)

 3      Q.   BY MR. SAHELIAN:  Mr. Shayler, this is also a

 4   photograph of you next to your Volkswagen; correct?

 5      A.   Uh-huh.

 6      Q.   Is that a yes?

 7      A.   Yes.

 8      Q.   All right.  And you're leaning over with the

 9   level gauge in your left hand, I'm guessing to take a

10   slope measurement; correct?

11      A.   Yes.                                              15:50

12      Q.   Okay.  And can you tell -- perhaps Audrey can

13   magnify the photograph -- next to your feet, can you tell

14   there's cracking on the asphalt?

15      A.   Yes, there is.

16          MR. SAHELIAN:  All right.  Okay.  We're going to

17   mark this as Exhibit 18.

18      Q.   And that's you again bent all the way and        15:51

19   taking a slope measurement; correct?

20      A.   Uh-huh.

21      Q.   Is that a yes?

22      A.   Yes.

23      Q.   All right.  And can you tell me when you were

24   taking that measurement?

25      A.   No, I could not tell you when.  I'm not sure     15:51
```

08/03/2022

JAMES WILLEY SHAYLER

Page 74

 1   where that is.

 2       MR. SAHELIAN:  All right.  Maybe some additional

 3   pictures might help.  We're going to mark this as Exhibit

 4   19 and move to Exhibit 20.

 5           (Exhibits 19 and 20 were referenced.)

 6       Q.   BY MR. SAHELIAN:  All right.  Is this you

 7   taking a photograph of a level gauge on the ground,

 8   Mr. Shayler?                                              15:52

 9       A.   Yes.  Yes, it is.

10       MR. SAHELIAN:  Okay.  So we'll mark this as Exhibit

11   20.  Move to 21.

12           (Exhibit 21 was referenced.)

13       Q.   BY MR. SAHELIAN:  Is this you once again bent

14   taking a picture of a level gauge?

15       A.   Uh-huh.

16       Q.   Is that a yes?

17       A.   Yes.

18       MR. HASHEMI:  Give an audible response, please.     15:52

19       THE WITNESS:  Yes.

20       MR. SAHELIAN:  All right.  We're going to mark this

21   as 21 and move to 22.  We don't need this one.  Let's

22   move to the next.  Next.  Next.  Next.  Keep going.

23   Next.

24           All right.  Are you able to see the entire

25   photograph?  We're going to mark this as Exhibit 22.     15:53

JAMES WILLEY SHAYLER

Page 75

```
 1      A.    Uh-huh.

 2            (Exhibit 22 was referenced.)

 3      Q.    BY MR. SAHELIAN:  Is that a yes?

 4      A.    Yes.

 5      Q.    Is that you in the photograph, Mr. Shayler?

 6      A.    Yeah, I'm hunched over, yeah.            15:53

 7      Q.    All right.  So would it be fair to say that

 8   you're walking towards a -- what looks like a sidewalk?

 9      A.    Yeah, it's hard to tell what that is.  Yeah,

10   it looks that way.

11      Q.    Perhaps something that's a few inches higher  15:54

12   than the asphalt?

13      MR. HASHEMI:  Calls for speculation, lacks

14   foundation, argumentative.

15      THE WITNESS:  Yeah, I'm not sure what the

16   sidewalk -- what level it is.

17      Q.    BY MR. SAHELIAN:  Okay.  Can you tell me what

18   you're walking towards here?

19      A.    Looks like maybe an entrance maybe, I'm not

20   sure.                                               15:55

21      Q.    All right.  Could that be a sidewalk?  Don't

22   guess, but can you tell me if that's possibly a sidewalk

23   you're walking towards?

24      MR. HASHEMI:  Calls for speculation.

25      THE WITNESS:  Could be.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 76

```
 1        MR. SAHELIAN:  All right, next.  Okay.  We're going
 2   to mark this as Exhibit 23.
 3            (Exhibit 23 was referenced.)
 4        Q.   BY MR. SAHELIAN:  Mr. Shayler, is that you in   15:55
 5   the photograph?
 6        A.   Yes, it is.
 7        Q.   What does it look like you're doing here in
 8   this photograph?
 9        A.   Looks like I'm stepping up.
10        Q.   Stepping up into what?
11        A.   Looks like a sidewalk or to an entrance
12   somewhere.
13        Q.   All right.  Sorry I interrupted you.  What did  15:55
14   you say?
15        A.   Either a market or a liquor store or
16   something, I'm not sure.
17        Q.   All right.  So would it be fair to say that
18   your leg is -- your right leg is on a sidewalk and your
19   left leg is on a parking lot on the ground?
20        A.   Yeah, it looks that way.  It's hard to tell   15:56
21   what those black things are, what that is.
22        Q.   So would it be fair to say that your right
23   foot is elevated while your left foot is on the asphalt?
24        A.   Yeah.
25        Q.   Were you able to lift your right foot up
```

08/03/2022

JAMES WILLEY SHAYLER

Page 77

1    easily?

2         A.    That was a good day, yeah.

3         Q.    I'm sorry, what did you say?

4         A.    That was a good day, yes.                    15:56

5         Q.    I see.  All right.  Let's go to the next.

6    Let's go back to the previous photograph.  Now again

7    I'm -- I believe this was 23; correct?

8         THE REPORTER:  Yes.

9         Q.    BY MR. SAHELIAN:  Your one hand is in your

10   pocket.  And do you normally walk with your hands in your    15:57

11   pocket, Mr. Shayler?

12        A.    No, I must have been getting something out of

13   my pocket.

14        MR. SAHELIAN:  Okay.  All right, let's move to the

15   next.  Okay, we're going to mark this as Exhibit 24.

16             (Exhibit 24 was referenced.)

17        Q.    BY MR. SAHELIAN:  Is that you in the            15:58

18   photograph, Mr. Shayler?

19        A.    (No audible response.)

20        Q.    Did we lose audio?  I think we lost -- I think

21   we lost communication with the court reporter.

22        THE REPORTER:  I'm here.  I'm here.

23        Q.    BY MR. SAHELIAN:  Oh, okay.  Can you hear,      15:58

24   Mr. Shayler?  Mr. Shayler?  Mr. Hashemi?  Did we lose

25   them?

JAMES WILLEY SHAYLER

Page 78

```
 1          THE REPORTER:  I have no idea.

 2          MR. SAHELIAN:  Audrey, you still there?

 3          EXHIBIT TECHNICIAN:  Yeah, I'm still here.  I think      15:59

 4    their video is fine.  I'm not sure about their audio.

 5          MR. SAHELIAN:  Linda, maybe we should restart the

 6    link.  What do you suggest?

 7          THE REPORTER:  Can I go off the record?

 8          MR. SAHELIAN:  Yes.                                      15:59

 9              (Brief recess.)

10          Q.   BY MR. SAHELIAN:  So that is you in the

11    photograph?  Are you able to tell me what you're walking     15:59

12    on?

13          A.   What do you mean walking on?                       16:03

14          Q.   Well, what are you stepping on here?  What's

15    on the ground?

16          A.   Oh, those are mats.

17          Q.   Are you --

18          A.   This was me walking through the door.

19          Q.   Okay, are you comfortable walking over mats?

20          MR. HASHEMI:  Objection, vague.

21          Q.   BY MR. SAHELIAN:  Does it cause you any pain?      16:03

22          A.   Causes me anxiety.  My walker catches those

23    mats.

24          Q.   All right.  Are you experiencing anxiety there

25    walking over the mat?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 79

```
 1        A.    No, I can tell I'm in pain, but...

 2        Q.    So my question was are you experiencing

 3   anxiety walking over the mats in this photograph?        16:04

 4        A.    I'm not sure what I'm experience.  I can see I

 5   was in pain.  By my facial expression.

 6        Q.    All right.  Does this refresh your memory,

 7   this photograph of you walking into a store with an ATM

 8   on one side and what looks like a lottery dispenser,       16:04

 9   lottery ticket dispenser on the other?  Does this refresh

10   your memory as to where you were?

11        A.    No.  Huh-uh.

12        MR. SAHELIAN:  All right.  Let's move on to the

13   next.  Next.  We're going to skip through the next few

14   exhibits.  Keep going.  Keep going.  All right, let's

15   take a look at this photograph.  Keep going.  Next.  All   16:05

16   right.  Let's take a look at this.

17             We're going to mark this as I believe Exhibit

18   25.  Audrey, can you center the photograph, please?

19             (Exhibit 25 was referenced.)

20        Q.    BY MR. SAHELIAN:  All right.  Is that you in    16:05

21   the photograph, Exhibit 25, Mr. Shayler?

22        A.    Yeah, it looks like me, uh-huh.

23        Q.    What does it look like you're doing here in

24   this photograph?

25        A.    I'm -- I'm not sure.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 80

1    Q.   Could it be you're carrying around loose

2  change in a Ziploc bag?

3    A.   Yeah, looks like that is a Ziploc bag with        16:06

4  some change, uh-huh.

5    MR. SAHELIAN:  All right.  Audrey, would you expand

6  the area where his hands are?

7    Q.   All right, Mr. Shayler, is that you holding

8  loose change in your left-hand?

9    A.   Yeah, my left hand, yeah.

10    Q.   And what are you doing with your right hand?

11    A.   I think I'm grabbing that baggie or grabbing

12  the corner of, I'm not sure.                             16:07

13    Q.   Can you tell your fingers are inside the bag?

14    A.   It looks like one finger is.  Yeah.

15    MR. SAHELIAN:  All right.  Okay.  So we're marking

16  this as Exhibit 25.  Next.  I think we can move through

17  these photographs until he gets to the sidewalk, Audrey.  16:07

18  If you would just show me all the photographs, I can

19  tell --.  Oh, there you go.  That's the one.  All right,

20  Mr. Shayler, we're going to mark this as Exhibit 26.

21         (Exhibit 26 was referenced.)

22    Q.   BY MR. SAHELIAN:  Is that you in this

23  photograph?

24    A.   Yes, it is.

25    Q.   And that's your right foot elevated; correct?

08/03/2022

JAMES WILLEY SHAYLER

Page 81

```
 1      A.    Yes.                                          16:07

 2      Q.    Can you tell me -- can you describe the

 3   location here relative to the store?

 4      A.    No, I couldn't tell you location.

 5      Q.    Would it be fair to say you're about to -- or

 6   would it be fair to say that you have just exited the

 7   door?                                                  16:08

 8      A.    Yes.

 9      Q.    And would it be fair to say that you're about

10   to step down the sidewalk?

11      A.    Looks like I am getting ready to step down.

12      Q.    And that you have a drink in your right hand?

13      A.    I have a --

14      MR. SAHELIAN:  Audrey, would you blow up --

15      THE WITNESS:  Yeah, I could see that.  I could see  16:08

16   that, yeah.  I do have a drink in my right hand.

17      MR. SAHELIAN:  Okay, next photograph.  Center this.

18           (Exhibit 27 was referenced.)

19      Q.    BY MR. SAHELIAN:  Does this photograph that

20   we're going to mark 27 look like you've made it onto the

21   asphalt surface?

22      MR. HASHEMI:  Objection, lacks foundation,

23   argumentative.                                         16:09

24           Go ahead.

25      THE WITNESS:  Yes.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 82

```
 1      Q.    BY MR. SAHELIAN:  So you've stepped off the
 2  sidewalk; is that correct?
 3      MR. HASHEMI:  Objection, argumentative, lacks
 4  foundation.  Go ahead.
 5      THE WITNESS:  Yes.
 6      Q.    BY MR. SAHELIAN:  And your left foot now is
 7  elevated off the ground; is that correct?
 8      A.    Uh-huh, yes.
 9      Q.    Is that a yes?
10      A.    Yes.
11      Q.    And you're -- I'm assuming you're now headed      16:09
12  back to your car?
13      A.    Yes.
14      MR. SAHELIAN:  All right, so we've marked this as
15  Exhibit Number 27.
16          Next.  Keep going.  Until he reached reaches
17  his car.  Okay.  We're going to mark this as Exhibit 28.
18          (Exhibit 28 was referenced.)
19      Q.    BY MR. SAHELIAN:  Mr. Shayler, is that you      16:10
20  standing next to what looks like an orange car?
21      A.    Yes.
22      Q.    And would you agree with me that you're
23  opening the door with your right hand?
24      A.    Yes.
25      MR. SAHELIAN:  Okay.  Did we mark this as an
```

08/03/2022

JAMES WILLEY SHAYLER

Page 83

1    exhibit?

2                (Record read.)

3         MR. SAHELIAN:  Yes.  Audrey, I think we can skip     16:10

4    these, this series of photographs and go to the site

5    inspection.  All right.  So let's go to Exhibit 29.

6                (Exhibit 29 was referenced.)

7         Q.    BY MR. SAHELIAN:  Mr. Shayler, relative to the   16:11

8    lawsuit in this case which involves an Irish Pub, does

9    this photograph of a parking lot look familiar to you?     16:11

10        A.    Yes, it does.

11        MR. SAHELIAN:  We're going to mark this as Exhibit

12   29.  I'm going to have Audrey blow up a little bit the

13   center portion.

14        Q.    Okay, tell me, Mr. Shayler, did you visit the

15   Irish Pub?                                                  16:12

16        A.    Yes.

17        Q.    How far away is it from your place of

18   residence?

19        A.    I'm not sure.

20        Q.    You know where the Irish Pub is located?

21        A.    In Lawndale, isn't it?

22        Q.    And have you ever had a drink at the Irish

23   Pub?

24        A.    Yes.

25        Q.    How many times?                                  16:13

08/03/2022

JAMES WILLEY SHAYLER

Page 84

```
 1       A.    One time.

 2       Q.    What was the date?

 3       A.    It was the 15th.

 4       Q.    15th of?

 5       A.    The 15th of September.

 6       Q.    What year?

 7       A.    2021.

 8       Q.    How do you know that was the date?            16:13

 9       A.    How do I know that was the date?  I looked at

10  the Complaint.

11       Q.    Any other reason why you would know that was

12  the date?

13       A.    No.

14       Q.    All right.  So on September 15th, 2021, you    16:13

15  arrived I'm assuming to this place from your place of

16  residence; is that correct?

17       A.    No.  I was in Long Beach.

18       Q.    Did you have a doctor's appointment that day?

19       A.    Yes, with Dr. McCloy.                          16:14

20       Q.    All right.  So on your way back, you decided

21  to take the doctor's advice and head to an Irish Pub?

22  That was a joke, Mr. Shayler.  You don't have to answer

23  that.

24       A.    No, the doctor --

25       Q.    I thought perhaps he advised you to hit the
```

08/03/2022

Page 85

```
 1   Irish Pub so -- so you could forget about your visit.        16:14
 2            All right.  So what time of the day was it?
 3       A.   Oh, I'm not sure what time of the day it was.
 4   Probably about one o'clock.  Two o'clock.  Something like
 5   that.  I'm not sure.
 6       Q.   And you were able to go in; correct?
 7       A.   Yeah, I believe that was a bad day.  That was
 8   a day I had to use a walker.                                 16:15
 9       Q.   All right.  And did you sit at the bar and
10   have a drink or a table?
11       A.   I think I sat at a booth.  And -- and had a --
12   a Corona beer.
13       Q.   Did you have somebody with you?
14       A.   No, just me.
15       Q.   Do you remember if anyone served you?
16       A.   I believe a lady did.
17       Q.   Can you tell me what she looked like?           16:15
18       A.   She had dark brown hair or black hair, and she
19   was nice.
20       Q.   How old was she?
21       A.   Oh, I don't know, maybe 30, 35, I'm not sure.
22       Q.   Did you pay for it using a credit card?
23       A.   Yeah.  Yeah.
24       Q.   Did you keep the receipt?
25       A.   Um, I did keep the receipt, yes.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 86

```
 1        Q.    All right.  Besides a beer, did you have          16:16
 2    anything else?
 3        A.    No, just a beer.
 4        Q.    Now when you had your -- you said you took
 5    your walker in with you; correct?
 6        A.    Yes.
 7        Q.    Was the door, back door that we're staring at
 8    right now in Exhibit 29, was that back door closed or
 9    open when you went in?
10        A.    It was closed.
11        Q.    So how did you manage to get your walker in    16:17
12    with the door closed?
13        A.    I'm not sure if I went through the back door
14    or the front door, I'm not sure.  I think I went through
15    the front door.
16        Q.    All right.
17        A.    I'd never been there before.
18        Q.    All right.  So does the accessible parking
19    space look familiar to you?
20        A.    Yes.
21        Q.    Did you park there?                              16:17
22        A.    Yes, I did, uh-huh.
23        Q.    And did you park backwards or did you park
24    head-on?
25        A.    I parked it head-on.
```

JAMES WILLEY SHAYLER

Page 87

1      Q.    With your headlights facing the wall; correct?

2      A.    Yes.

3      Q.    And you were staring at the big Irish Pub sign      16:17

4   right above you; correct?

5      A.    Yes.

6      Q.    All right.  And you exited the driver's side;

7   correct?

8      A.    That's correct.

9      Q.    And you took your cane with you; correct?

10      A.    No, I took a walker.

11      Q.    All right.  How did you get to the walker?      16:18

12      A.    I exited my door, went to the back and took my

13   walker out.

14      Q.    All right.  So you walked to the back of the

15   car without a cane?

16      A.    Yeah, I usually hold onto the side of the car

17   when I -- when I go back there if it's a bad day like

18   that day was.

19      Q.    So that's what you normally do; right?  You      16:18

20   just use the car as support; right?

21      A.    Right.

22      Q.    Instead of using the cane; right?

23      A.    Yes.  Sometimes.

24      Q.    Well, what would you do other times?

25      A.    Sometimes I use the cane, sometimes I use the

08/03/2022

JAMES WILLEY SHAYLER

Page 88

```
 1   car as support, it just depends.
 2        Q.   All right.  Did you have your cane with you
 3   that day?
 4        A.   Yes.
 5        Q.   All right.  But you didn't use it; right?
 6        A.   Huh-uh, I used the walker that day.            16:19
 7        Q.   All right.  So where was the walker located?
 8        A.   In the rear of the car.  The -- the rear
 9   section.
10        Q.   All right.  Which car were you driving that
11   day?
12        A.   My -- the Tiguan, the Volkswagen Tiguan.
13        Q.   What makes you realize that it was the Tiguan  16:19
14   that you were driving?
15        A.   Because at that time I had a -- I had the
16   Tiguan.
17        Q.   Okay.  What date was that?
18        A.   September 15th of 2021.
19        Q.   When did you sell or dispose of the Tiguan?
20        A.   Earlier this year.  The lease was up.          16:20
21        Q.   Okay.  So now you're in the back of your car,
22   and you pulled out your walker; correct?
23        A.   Right.
24        Q.   And did you close the back hatch?
25        A.   Yes.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 89

1       Q.     And you were able to reach -- reach up to be

2   able to grab the back hatch and you pull it down?          16:20

3       A.     Yeah, with my left hand.

4       Q.     All right.  What did you do then?

5       A.     I believe then I went -- I tried to go --.  I

6   don't know if I tried to go to the back door.  I don't

7   think I did.  I think I walked around, walked down the

8   slope around.

9       Q.     So you walked -- if you're -- if I get your

10  testimony, you took your walker out of the back of the     16:21

11  car, and then you walked down the slope towards the

12  sidewalk; correct?

13      A.     Correct.

14      Q.     And you followed the sidewalk; correct?

15      A.     Yes.

16      Q.     Towards that black pickup truck on your right;

17  correct?

18      A.     I don't -- I'm not sure what was a black         16:21

19  pickup truck or what was there.  All I know is I walked

20  around -- down the slope to the -- to the sidewalk, and

21  then I walked to the -- went through the front door.

22      Q.     Went to the front door.  Is there anything

23  about the front door that you remember?

24      A.     Yeah, it was a little heavy to open.  It was a   16:22

25  little hard to open with my walker, but I had a silver

JAMES WILLEY SHAYLER

Page 90

1    walker then, and it was a different kind.  And it

2    catches.  That's why I got rid of it, it catches those

3    mats.

4         Q.   Got it.  And was it -- was there a step up

5    into the front door?

6         A.   I don't believe so.  No.

7         Q.   So it was flat going right through; correct?

8         A.   Yes.  Believe so.                                16:22

9         Q.   So -- so -- so from the -- to get to the

10   entrance from the sidewalk, you just had to open the door

11   and walk right through; correct?

12        A.   Yeah, I believe so, yeah.

13        Q.   All right.  So when you walked in, what did

14   you see?

15        A.   Kind of dark in there.  I saw a bar on the

16   left-hand side, and then I believe there were booths on

17   the right-hand side, and I sat down on -- I think I may   16:23

18   have gone to the bar, sat on the bar.  I think I sat on

19   the bar.  I don't know if it was a booth or not, but I

20   ordered a Corona and -- and ordered a Corona beer and

21   drank it.

22        Q.   All right.  How long did you stay there?

23        A.   Oh, I don't know, probably a half an hour.

24        Q.   All right.  And then how did you -- strike

25   that.  After you had your drink, what did you do?        16:23

JAMES WILLEY SHAYLER

1      A.    I asked if I could go through the back door,

2   and I went out the back door to my car.

3      Q.    So which is the back door?

4      A.    The back door is in the back where your

5   disability parking is.

6      Q.    Okay.  Is that the one we're staring at right

7   now, Exhibit 29?                                          16:24

8      A.    Yes.

9      Q.    Did you have any difficulty making your way

10   towards the back of the Tiguan?

11      A.    Yeah, with that slope, it caused me some

12   difficulty, yes.

13      Q.    All right.  So what sort of difficulty did it

14   cause you?

15      A.    Anxiety, frustration, pain.

16      Q.    All right.  Let's start with anxiety.  Tell me   16:24

17   all about the anxiety that you experienced trying to make

18   your way back to the back of the Volkswagen.

19      A.    All of that slope at that -- at that angle, it

20   makes it -- I get anxiety, I think I'm going to fall, and

21   that day was a very bad day for me, so I get anxiety, I   16:25

22   think I'm going to fall, start sweating, my heart starts

23   beating fast.

24      Q.    All right.  And what's the other thing you

25   said besides anxiety?

08/03/2022

JAMES WILLEY SHAYLER

Page 92

```
 1        A.     Frustration.

 2        Q.     All right.  What was it that frustrated you?

 3        A.     I had to -- with that angle, that slope, it

 4    takes you off balance a little bit, and it's frustrating.   16:25

 5        Q.     All right.  And what was the other thing that

 6    you mentioned?

 7        A.     Pain.

 8        Q.     Pain.  All right.  Tell me what sort of pain

 9    you experienced above and beyond the normal pain that

10    you --

11        A.     Well, my leg muscles are weak.  And when I

12    have to maneuver, you know, up and down a slope, my legs,   16:26

13    the muscles have to work harder, so they -- I experience

14    more pain.

15        Q.     Okay.  Very well.  Now did you that day take

16    any measurements of this place?

17        A.     I believe when I came back out I did.

18        Q.     All right.  And tell me, let's start with the

19    accessible parking space.  What was the slope on that?     16:26

20        A.     On the accessible, on the -- I believe it was

21    at nine something.  Nine -- nine -- nine inches and

22    something.  So I'm not -- you know, I believe it was.

23        Q.     Okay.  We're talking about where -- right

24    below where your car was parked.  Okay?

25        A.     Yeah.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 93

```
 1      Q.    We're talking about the ground under the car.   16:27
 2   What was the slope --
 3      A.    Oh, I didn't take measurements of that.  I
 4   took of the accessible space next to it.
 5      Q.    So you --
 6      A.    That's where I experienced the problems.
 7      Q.    So you took a measurement of the access aisle
 8   slope; is that correct?
 9      A.    Right.
10      Q.    Was your car centered right within the
11   parking --
12      A.    Yes.
13      Q.    -- space?
14      A.    Yes.
15      Q.    You hadn't parked past the line past -- past   16:27
16   the limit into the access aisle; had you?
17      A.    No.
18      Q.    All right.  So how far away were your tires
19   from the blue line?
20      A.    Tires within -- within the two blue lines of
21   the disability space.
22      Q.    Did you have at least maybe six inches of     16:28
23   clearance between the blue line and your tires?
24      A.    Yeah, maybe at least six, maybe eight.  I
25   don't know.  Something like that.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 94

1       Q.   All right.  Okay.  So you measured the slope

2   on the access aisle.  Did you measure every corner of the

3   access aisle or did you just --?  What did you do?

4       A.   I just took a random space and saw what the        16:28

5   measurements were and took a picture of it.

6       Q.   You have those pictures?

7       A.   They are somewhere here.  I'm not sure.  I

8   don't have pictures of them.

9       Q.   Well, you --

10       A.   Yeah.

11       Q.   You took pictures using your phone I'm going

12   to assume; right?

13       A.   That's correct.

14       Q.   All right.  What did you do with those

15   pictures?

16       A.   I deleted them after I sent them to the           16:29

17   attorney.

18       Q.   Why would you want to delete them?

19       A.   I -- I don't need them after I send them to

20   the attorney.  I don't have any use for them.

21       Q.   Did you email them?

22       A.   Yes.

23       Q.   All right.  So as you're staring at this

24   photograph -- and I'm going to have Audrey expand the      16:29

25   center portion.  All right?  That's good, Audrey.  Thank

JAMES WILLEY SHAYLER

 1    you.

 2             What part of the access aisle did you measure?    16:30

 3    For instance, let's start with -- you see where the door

 4    is.  Did you measure near the door?

 5        A.    Probably -- I think I measured right past the

 6    door on the right-hand side for sloping down.

 7        Q.    Okay.  So right hand as we're looking at it.

 8    So towards the wall that does not have the Irish Pub      16:30

 9    sign; correct?

10        A.    That's correct.

11        Q.    Near the window; correct?

12        A.    I don't know if there's a window there, but --

13        Q.    Well, can you --

14        A.    Yeah.

15        Q.    -- look at the photograph.  Do you see the

16    window?

17        A.    I -- she enlarged it.  Yeah, right -- yeah, I

18    don't -- can't see the window.  I can't see it.  She

19    enlarged it, so...

20        Q.    All right.                                      16:31

21        A.    Is that a window?  I can't tell.  It's dark.

22    Yeah.  Maybe that is.

23        Q.    She's going to blow it up some more here so

24    you can see the window.

25        A.    I see it.

08/03/2022

JAMES WILLEY SHAYLER

Page 96

```
 1       Q.    Okay.  Very good.

 2       A.    It was before the window.

 3       Q.    So it was on the window side that you took

 4  slope measurements; is that correct?

 5       A.    Right, within the access aisle, yeah.

 6       Q.    So I want you to avoid saying "right" because

 7  it's confusing.  It's a directional thing.  So I want you      16:31

 8  to say correct.  You got it?

 9       A.    I understand.

10       Q.    All right.  So you took a slope measurement at

11  the access aisle closer to the window; is that correct?

12       A.    Correct.

13       Q.    All right.  Now what did you measure in terms

14  of slope?

15       A.    I measured the slope of the access aisle.       16:32

16       Q.    Understood.  What was your read?

17       A.    Nine point something.

18       Q.    Nine percent?

19       A.    Nine point -- yeah, nine percent and some

20  change.  I don't know what the change was.

21       Q.    All right.  How far away were you from the

22  wall?

23       A.    Oh, a couple -- couple feet.                    16:32

24       Q.    Okay.  Did you take any measurements further

25  away from the wall?
```

JAMES WILLEY SHAYLER

Page 97

1      A.   I just took one measurement.

2      Q.   Can you tell me how far away from the wall you

3   were?

4      A.   I -- I can't tell because I don't have those

5   pictures.  But I would -- I'm -- for me to guess if --.      16:33

6   I can't tell you.  I just don't know how far I was away

7   from the wall.

8      Q.   Did you take a photograph of the device that

9   was placed on the ground like you did in previous

10   photographs?

11      A.   Yes.

12      Q.   And you only took one measurement; is that

13   your testimony?

14      A.   Yes, that's -- I took one measurement.

15      Q.   All right.  What about on the left side of the

16   access aisle near the Irish Pub sign?                          16:33

17      A.   I didn't take any -- I don't believe I took

18   any pictures or I measured anywhere near there.

19      Q.   Is there a reason why?

20      A.   I -- well, I didn't have a problem I -- when I

21   went down.  The slope is when I had a -- started having        16:34

22   problems, so I didn't have no reason to measure that.

23      Q.   So as you're looking at this access aisle, you

24   are telling me you went through the front door, and then

25   you exited the bar through the back door, and you

08/03/2022

JAMES WILLEY SHAYLER

Page 98

 1    experienced the slope at the access aisle; correct?

 2         A.    Correct.

 3         Q.    Is there a reason why you didn't exit through

 4    the front door?                                          16:34

 5         A.    Well, I want to get the shortest distance from

 6    me to my car.

 7         Q.    Well, if that were the case, why didn't you go

 8    in through the back door in the first place?

 9         A.    Because I didn't know if it was locked or not.

10    You know, I didn't think it was locked, so I -- like you

11    said, when I went down that slope, I noticed that it

12    was -- you know, it was steep, and I noticed it was      16:35

13    giving me difficulty.

14         Q.    So you just testified a moment ago that part

15    of the access aisle did not give you any difficulty;

16    correct?

17         MR. HASHEMI:  Objection, misstates prior testimony.

18         Q.    BY MR. SAHELIAN:  And that that was the reason

19    why you didn't measure that portion?

20         A.    Correct.

21         Q.    So as you exited the door here, what part of

22    the access aisle did you follow --                       16:36

23         A.    I think that --

24         Q.    Let me finish.  As you exited the door, what

25    part of the access aisle did you follow to get to the

JAMES WILLEY SHAYLER

1   back of your car?  Was it the part that was closer to

2   your car or the part that was away from your car?

3          A.   The way the door opened, you're at the bottom          16:36

4   of the access aisle.  Or at the -- the way the door

5   opens, you walk on the bottom of the access aisle.

6          Q.   You mean at the center?

7          MR. HASHEMI:  Objection, misstates testimony,

8   argumentative, and leading.

9          Q.   BY MR. SAHELIAN:  So would you --

10         A.   When you open the door, the door opens this

11  way, and you're going on the bottom of the access aisle.

12         Q.   All right.  What did you do after the door          16:36

13  closed?

14         A.   I went to my car.

15         Q.   No.  Slow down.  Slow down.  Which direction

16  did you walk when the door closed?

17         A.    I walked towards my car.

18         Q.    All right.  So would it be fair to say that

19  you took the shortest distance towards your car; correct?

20         MR. HASHEMI:  Objection, leading, lacks foundation.          16:37

21         THE WITNESS:  The way the door opens, you have --

22  you're going to go through the bottom, and I -- I took

23  the bottom to my car.  To the access aisle.

24         Q.   BY MR. SAHELIAN:  Okay.  So once the door

25  closed, did you walk the shortest distance towards your

08/03/2022

JAMES WILLEY SHAYLER

Page 100

```
 1   car?  Strike that.

 2        A.    No, I did not.

 3        Q.    Let me -- let me rephrase it.  Did you use the       16:37

 4   shortest distance possible to walk towards your car?

 5        A.    No, I did not.

 6        Q.    What would be the reason you didn't?

 7        A.    Because when I walked out the door, I noticed

 8   the slope on the -- was -- was quite bad.  And so I

 9   walked down there, took -- around my car using the         16:38

10   bottom, and then I went and got my level to see what it

11   was.

12        Q.    So, I'm sorry, you have me confused,

13   Mr. Shayler, so I'm going to have to break this down.

14   And I'm not as talented as your attorney is asking these

15   questions.  So let me go one step at a time.              16:38

16        The door closed.  Now, are you -- which

17   direction are you facing?  Are you facing towards your

18   car or are you facing towards the sidewalk?

19        A.    When I exit the door, I'm facing towards the

20   end of the access aisle, on the bottom part.

21        Q.    All right.  So you're looking down the access

22   aisle as you exit the door; is that correct?

23        A.    Yes.                                            16:39

24        Q.    All right.  So the door closes.  Which

25   direction are you facing?
```

JAMES WILLEY SHAYLER

Page 101

```
 1        A.    Away from the Irish Pub sign.

 2        Q.    So are you facing down the access aisle?  Are

 3   you facing --

 4        A.    I'm facing down the access aisle, correct.

 5        Q.    Through the center line of the access aisle;      16:39

 6   is that correct?

 7        A.    The bottom of the access aisle.

 8        Q.    I see.  Okay.  Do you see the center line of

 9   the access aisle?  You see there's a concrete break

10   there.  Do you see it?

11        A.    Yeah.

12        Q.    There's a thin line?

13        A.    Yeah.

14        Q.    All right.

15        A.    When I exited the door, I did not walk through

16   that.

17        MR. HASHEMI:  Objection.  Objection to the extent

18   that the statement stands for the proposition that that   16:40

19   line is in the center of the access aisle.

20             But otherwise, go ahead.

21        THE WITNESS:  Once you open, you're going to walk on

22   the bottom of the access aisle, way the door opens.

23        Q.    BY MR. SAHELIAN:  I hear you, Mr. Shayler, I

24   hear you.  Now you are staring down the access aisle.

25   You would agree with me that your car is to your right;
```

08/03/2022

JAMES WILLEY SHAYLER

Page 102

```
 1    correct?

 2        A.    Right.

 3        Q.    So now do you turn towards your car?

 4        A.    I just walked straight to the end of the      16:40

 5    access aisle, and then I went around to my car.

 6        Q.    So which side of the access aisle did you use

 7    to walk down the access aisle?  Did you use the part

 8    closer to your car or did you use the part away from your

 9    car?

10        A.    Because of how the door opens, I was at the

11    bottom of the access aisle.

12        MR. SAHELIAN:  Madam Court Reporter --             16:41

13        THE WITNESS:  Where the door opens.

14        MR. SAHELIAN:  Madam Court Reporter, would you

15    please read my question.

16            (The record was read as follows:

17              "So which side of the access aisle did you   16:41

18          use to walk down the access aisle?  Did you use

19          the part closer to your car or did you use the

20          part away from your car?")

21        MR. HASHEMI:  Mr. Shayler, I think what counsel is

22    trying to ask you is whether you walked down the side    16:41

23    that is clearly sloped towards the street or the side

24    that seems to be sloped the opposite direction.

25        THE WITNESS:  The opposite direction.
```

JAMES WILLEY SHAYLER

Page 103

```
 1        Q.    BY MR. SAHELIAN:  So you were --

 2        A.    The way the door opens, you're going to be

 3   kind of on the right-hand side of that access aisle.

 4        Q.    Okay.  So your attorney skillfully understood

 5   what I was trying to get you to answer.  So let me ask     16:42

 6   you again.  When you were walking towards the back of

 7   your car, were you close to your car and were you

 8   following the side of your car?

 9        MR. HASHEMI:  Objection, vague.

10        THE WITNESS:  Again, the way the door opens, I was    16:42

11   at the bottom of the access aisle walking towards the end

12   of my car.

13        Q.    BY MR. SAHELIAN:  All right.  So --

14        A.    Where it slopes down.

15        Q.    Did you walk diagonally towards the back of

16   your car or did you head directly towards your car and

17   following the side of your car?

18        A.    I walked straight to the end of the access

19   aisle, and then I walked to the back of my car.           16:43

20        Q.    Oh, I see.  Okay.  So you made sure that you

21   were on the sloped side of the access aisle all the way

22   down?  You made sure -- you made sure that you stayed on

23   the sloped side until you got to the end of the access

24   aisle, and then you made a turn, a right turn, and headed

25   to the back of your Volkswagen; correct?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 104

```
 1      A.    Right.                                          16:43

 2      MR. HASHEMI:  Objection, misstates prior testimony,

 3   argumentative.

 4           Go ahead, Mr. Shayler.

 5      THE WITNESS:  The way the door opens, you're at the

 6   bottom of the sloped side of the, um, access aisle.  And

 7   I walked straight to the end, and then I cut over to my

 8   car.

 9      Q.    BY MR. SAHELIAN:  All right.  So you see that

10   our two blue lines there in the access aisle --

11   correct? -- there's the one next to the window; right?

12   Do you see it?

13      A.    Right.

14      Q.    And there's the one that is next to your car;    16:44

15   correct?

16      A.    Right.

17      Q.    Or if your car were there.

18      A.    Right.

19      Q.    So you followed the blue line closest to the

20   window, and you walked straight down that blue line, and

21   then you made a 90-degree turn and walked towards the

22   back of your car; correct?

23      A.    Right, because the back of my car was right

24   there, so I just walked straight to the back, yes.        16:44

25      Q.    So I want to make sure that I have this down
```

08/03/2022

JAMES WILLEY SHAYLER

Page 105

1    correctly.  Because once again, I asked you not to use

2    the word right, and you used the word right.  So please

3    don't do that.

4              You exited the door, you allowed the door to

5    close, and then you followed the blue line that was

6    closest to the window all the way down, and then you made      16:45

7    a right turn and headed straight to the back of your car;

8    is that correct?

9        MR. HASHEMI:  Objection, leading, argumentative,

10   misstates prior testimony, asked and answered.

11             Go ahead, Mr. Shayler.

12       THE WITNESS:  Yes.  That's correct.

13       Q.   BY MR. SAHELIAN:  All right.  So was there a

14   reason after the door closed that you did not walk          16:45

15   towards your car following the wall, following the wall,

16   that you did not walk towards your car immediately?

17       A.   Because of the slope, I walked to the end of

18   the access aisle, and then I went to my car.  The way the      16:46

19   door opens, you're at the bottom -- you're at the bottom

20   part of the access aisle by the window, and I walked

21   straight out, and then I exited my -- put my walker away.

22       Q.   I understand, Mr. Shayler.  I perfectly

23   understand.  And you've told me what you did because of      16:46

24   the slope.  I understand that.  You don't have to repeat

25   that.  My question is different.  So please hear me out.

08/03/2022

JAMES WILLEY SHAYLER

Page 106

1           When the door closed, was there a reason why

2    you didn't turn your walker to face the car and walk

3    along the wall and the door so you could be on the other

4    side of the access aisle that is flat?                    16:47

5       MR. HASHEMI:  Objection, lacks foundation,

6    argumentative to the extent that the statements or the

7    inquiry suggests that the other side of the access aisle

8    is flat.

9           You can answer the question if you understand

10   it, Mr. Shayler.

11      THE WITNESS:  There's no -- there's no reason I

12   put -- I walked to the end of my car because that's where

13   I keep my walker.  And I put my walker away.             16:48

14      MR. SAHELIAN:  I'm going to have Madam Court

15   Reporter reread my question.

16           (The record was read as follows:

17              "When the door closed, was there a reason   16:47

18              why you didn't turn your walker to face the car

19              and walk along the wall and the door so you

20              could be on the other side of the access aisle

21              that is flat?")                             16:47

22      THE WITNESS:  Again, my answer is I go to the back

23   of the car because that's where I keep my walker.  I was  16:48

24   going to put it away.

25      Q.   BY MR. SAHELIAN:  You did testify,

08/03/2022

JAMES WILLEY SHAYLER

Page 107

1    Mr. Shayler, if I remember a few moments ago -- I should

2    say a few minutes ago -- that the portion of the access        16:48

3    aisle that was closest to the car was flat, and that's

4    why you didn't take a measurement there.  Wasn't that

5    your testimony?  Or do I have it wrong?

6         A.   No, I took a measurement where the slope was

7    because that's where I walked and was giving me problems.

8         Q.   All right.  Apparently you misunderstood          16:49

9    your -- or you forgot your testimony, but that's fine.

10              So let me ask you this:  You've filed over ten

11   cases in the past 12 months; correct?                       16:49

12        MR. HASHEMI:  Objection, lacks foundation,

13   argumentative, vague.

14              Go ahead.

15        THE WITNESS:  Yes.

16        Q.   BY MR. SAHELIAN:  Do you understand what the

17   frequent filer status is in the ADA world?

18        A.   Yes.

19        Q.   What do you understand it to be?

20        A.   Someone that files more than a certain amount      16:50

21   of cases a year.

22        Q.   What would that number be?

23        A.   I do not know.  Maybe 20.

24        Q.   All right.  So you also understand that there

25   are certain facts that you have to provide when you file

08/03/2022

JAMES WILLEY SHAYLER

Page 108

```
 1    these lawsuits, so I'll ask you to give me answers to      16:50

 2    those facts since they were absent from the Complaint.

 3              Number one, have you ever been to this Irish

 4    bar before the 15th of September of 2021?                  16:51

 5        A.    No.

 6        Q.    Have you since gone back?

 7        A.    My lawyer hasn't told me to go back yet.

 8        Q.    That wasn't my question.  Answer my question.

 9        A.    I plan on returning.                             16:51

10        Q.    That wasn't my question.

11        A.    Please repeat your question.

12    MR. SAHELIAN:  Madam Court Reporter?

13              (The record was read as follows:

14                "Have you since gone back?")                   16:51

15    THE WITNESS:  No.                                          16:52

16        Q.    BY MR. SAHELIAN:  What was the reason you were   16:52

17    in the neighborhood?

18    MR. HASHEMI:  Objection, asked and answered.

19    THE WITNESS:  I was in Long Beach.

20        Q.    BY MR. SAHELIAN:  How far away is Long Beach

21    from this place?

22        A.    A few exits up.

23        Q.    How many Irish bars are there between Long

24    Beach and this place?                                      16:52

25    MR. HASHEMI:  That calls for speculation.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 109

1      Q.    BY MR. SAHELIAN:  Do you know?

2      A.    I -- I have no idea.

3      Q.    All right.  How many bars are there between

4   Long Beach and this place?

5      MR. HASHEMI:  Calls for speculation.

6      THE WITNESS:  I have no idea.

7      Q.    BY MR. SAHELIAN:  Have you ever been to any

8   bar in Long Beach?

9      A.    No.

10      Q.    Have you ever been to any bar between this

11   place and Long Beach?                                    16:53

12      A.    Yes.

13      Q.    Where?

14      A.    I don't remember which bars I went to.

15      Q.    Have you ever sued any bars between this place

16   and Long Beach?

17      A.    Not that I recall.                              16:53

18      Q.    Okay.  But you've been to a bar between this

19   place and Long Beach; correct?

20      A.    Yes, I have.

21      Q.    Why didn't you go back there?

22      A.    Because I took an exit off the freeway, and I

23   ended up right there, and I saw an Irish Pub, and I

24   wanted to have a beer.                                   16:54

25      Q.    All right.  What exit was it that you took?

08/03/2022

JAMES WILLEY SHAYLER

Page 110

```
 1        A.    I do not remember.

 2        Q.    Why did you take that exit?

 3        A.    Because I wanted to have a beer.

 4        Q.    And what was it about that exit that screamed

 5   beer for you?

 6        MR. HASHEMI:  Objection, lacks foundation,

 7   argumentative.

 8        Q.    BY MR. SAHELIAN:  Did it say a beer here with

 9   a sign that said exit the freeway for beer?

10        MR. HASHEMI:  (Laughter.)

11        THE WITNESS:  I was in Lawndale, and I took an exit    16:54

12   and ended up right here.

13        Q.    BY MR. SAHELIAN:  I've now --.  Okay, so you

14   remember it said Lawndale.  Correct?

15        A.    Off the freeway it said Lawndale, yeah.

16        Q.    Okay.  What was it about Lawndale that

17   triggered your need for a beer?

18        A.    I was having a stressful day that day, and I

19   decided I wanted a beer.

20        Q.    So when did you formulate the idea of exiting    16:55

21   at the Lawndale exit to have a beer?

22        MR. HASHEMI:  Argumentative.

23        THE WITNESS:  405, when I was on the 405 Freeway.

24        Q.    BY MR. SAHELIAN:  So you were on the 405

25   Freeway, and you're driving along, and you thought of
```

08/03/2022

JAMES WILLEY SHAYLER

Page 111

```
 1  beer, and you saw the Lawndale exit, and you said, "This
 2  is where I'm going to find an Irish Pub"?  Is that how it    16:55
 3  worked?
 4        A.    No, I just looking for a bar to have a beer.
 5        Q.    All right, and what exit do you take off the
 6  405 to get to your house?
 7        A.    Jefferson.
 8        Q.    All right.  So how many exits is Lawndale from
 9  Jefferson?
10        MR. HASHEMI:  Calls for speculation.
11        Q.    BY MR. SAHELIAN:  Roughly.
12        MR. HASHEMI:  Calls for speculation.
13        THE WITNESS:  Maybe 20?  I don't know.
14        Q.    BY MR. SAHELIAN:  All right.  Why did you not    16:56
15  pick any other exit?
16        A.    I don't know.  I just took that exit and ended
17  up there.
18        Q.    All right.  So have you been to any bars next
19  to where you live?
20        A.    Yes.
21        Q.    Where?
22        A.    On the corner of Jefferson, across the street
23  from --                                                      16:57
24        Q.    I'm sorry, I --
25        A.    Jack --
```

08/03/2022

JAMES WILLEY SHAYLER

Page 112

```
 1      Q.    -- didn't understand that last part.

 2      A.    Across the street from Jack-In-The-Box,

 3   there's a bar that I've gone once there and had a beer.

 4      Q.    Only once?

 5      A.    Yes.

 6      Q.    Did you sue them?

 7      A.    No.

 8      Q.    Why didn't you go back there?

 9      A.    Because I wanted a beer, and I was quite a few   16:57

10   exits from there.

11      Q.    Do you normally drink and drive?

12      A.    Only one beer, so I'm within the limits.

13      Q.    That wasn't my question.

14      A.    No, I do not normally drink and drive.

15      Q.    Okay.  Were you taking pain medication at the

16   time?

17      A.    No.

18      Q.    This was in September of 2021.  Were you not

19   on -- under pain medication at the time?                 16:58

20      A.    No, I was not.

21      MR. HASHEMI:  Objection, asked and answered.

22      Q.    BY MR. SAHELIAN:  Were you taking any pain

23   medication in September of 2021?

24      A.    No.

25      MR. HASHEMI:  Objection, asked and answered,
```

JAMES WILLEY SHAYLER

Page 113

1    leading.

2        THE WITNESS:  No.

3        Q.    BY MR. SAHELIAN:  You sure?

4        A.    Yes.

5        Q.    Remember, you're -- you're -- you're          16:58

6    testifying as if you were in court.

7        A.    Right.

8        Q.    Were you experiencing any pain at all on the

9    15th of September of 2021?

10       A.    Yes.

11       Q.    But you were taking no pain medication that

12   day?

13       A.    I was not.

14       Q.    How often do you stop for a beer?              16:58

15       MR. HASHEMI:  Objection, vague.

16       THE WITNESS:  Not very often.

17       Q.    BY MR. SAHELIAN:  All right.  So besides this

18   place and that place that you mentioned next to your

19   house, what was the name of that place next to your

20   house?

21       A.    I'm not sure of the name of the bar next to my

22   house.  It's on the -- it's on Jefferson, and it --       16:59

23   there's a Jack-In-The-Box across the street from it.

24       Q.    Okay.  Besides these two bars, what other bars

25   have you been to?

08/03/2022

JAMES WILLEY SHAYLER

Page 114

1   A.   Between Lawndale and Long Beach, I've stopped

2   at a bar one time there some few years back.

3   Q.   How far back?

4   A.   Maybe -- maybe -- I don't know, maybe six

5   months ago, something like that.                    16:59

6   Q.   Did you sue the place?

7   MR. HASHEMI:   Aren't we going on overtime if we're

8   going to talk about bars for the balance of this

9   deposition?

10   Q.   BY MR. SAHELIAN:   Did you sue the place?

11   A.   No.

12   Q.   What was the name of the bar?

13   A.   I don't remember.

14   Q.   Do you remember what street it was on?

15   A.   No, I do not remember what street it was on.

16   Q.   So would it be fair to say --?   Well, I'm     17:00

17   going to ask you flat-out here.   In the past year, how

18   many times have you been to a bar?

19   A.   Maybe three times.

20   Q.   How many?

21   A.   Three.

22   Q.   Okay.   Name the three places.

23   A.   Irish Pub is one of them.   I think it's called

24   The Sly Fox or something like that.   The other ones I   17:00

25   can't remember.

JAMES WILLEY SHAYLER

Page 115

```
 1      Q.    You have no recollection at all?

 2      A.    No, I do not.

 3      Q.    What about the year prior?  How many bars you

 4   go to in -- why don't we say -- why don't we say between

 5   September of 2021 and September of 2020, how many bars

 6   you go to?

 7      A.    Didn't go to any bars that year.            17:01

 8      Q.    For the entire year.

 9      A.    (No response.)

10      Q.    What about between September of 2020 and

11   September of 2019, how many bars you go to?

12      A.    Couldn't tell you.  Don't remember.

13      MR. HASHEMI:  You're getting a little harassing,

14   counsel.

15      Q.    BY MR. SAHELIAN:  And prior to that, September

16   of 2019 to September of 2018, how many bars did you go    17:01

17   to?

18      A.    Don't remember.

19      MR. SAHELIAN:  Do you need a break?  I have another

20   15 minutes to go roughly.

21      MR. HASHEMI:  Yes.  Yeah, let's take a break?         17:02

22      THE WITNESS:  Yeah.

23      MR. SAHELIAN:  Okay.

24           (Recess.)

25      MR. SAHELIAN:  All right.  Ready to finish up?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 116

```
 1          MR. HASHEMI:  Yeah, let's do it.
 2      Q.    BY MR. SAHELIAN:  All right.  Mr. Shayler, you    17:02
 3  sued a company called 10616 Pico, which I will submit
 4  were depicted in the photograph where you stepped up and
 5  down the steps and you had your orange Tiguan.  Did you    17:10
 6  ever go back to that place?
 7      A.    On Pico?
 8      Q.    10616 Pico.  Yeah, that's the location.
 9      A.    Yes, I've been back there.  The market?
10      Q.    Yes.
11      A.    Yeah.
12      Q.    You sued a business on 10526 West Pico in        17:11
13  December of 2020.  Did you ever go back there?
14      A.    Yes, I've been back to there, uh-huh.
15      Q.    What did you do when you went back?
16      A.    To see if they corrected the barriers.
17      Q.    Did you buy anything?
18      A.    Yes, I -- I bought something.
19      Q.    You don't remember what?                         17:11
20      A.    Huh-uh, I don't remember what.  But they
21  corrected it.
22      Q.    All right.  You sued a doctor called Gary
23  Lazarus, OD; do you remember?
24      A.    Yes.
25      Q.    At 806 Manhattan Beach Boulevard?  Did you go    17:12
```

JAMES WILLEY SHAYLER

```
 1   back to use his services?

 2         A.    I'm currently still seeing that doctor, yes.

 3         Q.    When was the last time you saw him?

 4         A.    Probably six months ago.

 5         MR. SAHELIAN:  That last exhibit was Exhibit 29, so    17:13

 6   we're done with the exhibits, Audrey.  Thank you.

 7         Q.    Has that lawsuit resolved against Gary           17:13

 8   Lazarus?

 9         A.    The doctor?

10         Q.    Well, it's Gary M. Lazarus, OD.  I don't know

11   what that is.

12         A.    Yeah, that's --.  Yeah.

13         Q.    And you saw him six months ago?

14         A.    Yes.

15         Q.    And why did you sue him?

16         A.    Because the slope was greater than it should     17:13

17   have been.

18         Q.    Did he fix it?

19         A.    Yes.  The owner of the buildings fixed it,

20   yes.

21         Q.    Did you sue a restaurant called Isako Nam?

22         A.    I'd have to see what their address is.

23         Q.    1019 Manhattan Boulevard.                        17:14

24         A.    Manhattan Beach -- yeah, Manhattan Boulevard?

25   Yes.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 118

```
1       Q.    Did that case resolve?

2       A.    That case resolved.

3       Q.    Did you go back there?

4       A.    Yes, I did.

5       Q.    What did you do?

6       A.    I ordered some -- I ordered a coke, and they

7   had fixed their barriers.

8       Q.    Did you keep a receipt?

9       A.    I sent it to my attorney.                          17:14

10      Q.    That wasn't my question.

11      A.    I didn't keep a receipt, no.

12      Q.    Did you sue a place the address to which is

13  1617 La -- La Brea?

14      A.    La Brea?  La Brea Avenue, yes.

15      Q.    Did that case resolve?                             17:15

16      A.    No, it hasn't.

17      Q.    Did you sue a Pep Boys Manny Moe & Jack on

18  Ventura Boulevard in Studio City?

19      A.    That's still pending.

20      Q.    So you drove all the way to Studio City to sue

21  a Manny Moe & Jack?  Were there none in -- near where you   17:15

22  live?

23      MR. HASHEMI:  Objection, argumentative, lacks

24  foundation.  Vague.

25      THE WITNESS:  No, I -- I was over there doing Studio
```

08/03/2022

JAMES WILLEY SHAYLER

Page 119

1   City doing something.  I had problems with my tires.

2        Q.   BY MR. SAHELIAN:  And so what did you buy?

3        A.   I -- I don't know what I bought there or if I

4   bought anything.  I think I just got a business card, and    17:16

5   I had them look at my tires.

6        Q.   So did you sue a liquor store on 11312 Ventura

7   Boulevard in Studio City?

8        A.   That one's still pending.

9        Q.   Did you go back there?

10       A.   I haven't gone back there yet, no.

11       Q.   Okay.  Did you sue a Sushi Nozawa, again in       17:16

12   Studio City, 11288 Ventura?

13       A.   That -- on Ventura Boulevard?

14       Q.   Yes.

15       A.   That one's still pending on Ventura Boulevard.

16       Q.   Have you been back there?

17       A.   No, I have not.

18       Q.   Did you sue a gas station at 1934 Cahuenga?       17:17

19       A.   A Chevron station?

20       Q.   I can't tell you.  It's 1934 Cahuenga?

21       A.   I'm not sure.

22       Q.   You remember all the other places you sued

23   that you visited in September of 2021?                      17:17

24       A.   No, I don't.

25       MR. HASHEMI:  Objection, compound.

08/03/2022

JAMES WILLEY SHAYLER

Page 120

```
 1          Go ahead.

 2      THE WITNESS:  No, I don't.

 3      Q.    BY MR. SAHELIAN:  Do you remember the places

 4  that you visited in September of 2021 that you ended up

 5  suing?

 6      MR. HASHEMI:  Objection, lacks foundation,

 7  argumentative.  Compound.                              17:18

 8          Go ahead.

 9      THE WITNESS:  No, I don't.

10      Q.    BY MR. SAHELIAN:  Do you remember visiting a

11  property at 10200 Hawthorne Boulevard in Inglewood in

12  September of 2021?

13      A.    No, I don't remember.

14      Q.    Do you remember visiting a property on Prairie

15  Avenue in September of 2021 that you sued?            17:18

16      A.    Prairie Avenue?

17      Q.    15014 Prairie Avenue.

18      A.    I don't.  Doesn't ring a bell.

19      Q.    You remember suing a property on 15202 Prairie

20  Avenue in Lawndale in September of 2021?

21      A.    No, I don't remember.

22      Q.    Do you remember visiting property -- a        17:19

23  property located at 1155 East Colorado Boulevard in

24  September of 2021?  That's in Pasadena.  It's a Michael's

25  store.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 121

| | | | |
|---|---|---|---|
| 1 | A. | I remember that. | 17:19 |

2    Q.    Have you been back there?

3    A.    I have not been back there.  It hasn't settled

4 yet.

5    Q.    Do you remember suing a property located at

6 475 Foothill Boulevard in La Canada in September of 2021?    17:20

7    A.    Is that a Star -- Starbucks, I believe?

8    Q.    I can't tell you.

9    A.    I don't recall.

10    Q.    Do you remember suing a donut store at 11038

11 South Inglewood Avenue in Inglewood in September of 2021?

12    A.    No, I don't recall.    17:20

13    Q.    Do you remember suing a property located at

14 403 South La Brea Avenue in Inglewood in September of

15 2021?

16    A.    No, I don't recall.

17    Q.    You don't recall visiting that property in

18 September?

19    A.    I recall visiting some properties in Inglewood

20 off La Brea, yes.    17:21

21    Q.    Do you remember --

22    A.    Yeah.

23    Q.    Sorry, go ahead.

24    A.    No, there was a rental equipment place I

25 think, but that's all I -- I can think of.

08/03/2022

JAMES WILLEY SHAYLER

Page 122

1    Q.    Do you remember visiting a property at 16829

2    Prairie Avenue in September of 2021?  That's in Lawndale.

3         MR. HASHEMI:  What was that address again, counsel?

4         MR. SAHELIAN:  16829 Prairie in Lawndale.          17:21

5         MR. HASHEMI:  Is that a trick question?

6         MR. SAHELIAN:  I don't think so.

7         THE WITNESS:  What was the address again?

8         MR. SAHELIAN:  16829 Prairie Avenue in Lawndale.

9         THE WITNESS:  Yeah, on September 15th of 2021.

10        Q.    BY MR. SAHELIAN:  All right.  Do you remember

11   suing a property located at 5950 Paramount Boulevard in   17:22

12   Long Beach in September of 2021?

13        A.    No, I don't recall.

14        Q.    Do you remember suing a property located at

15   41 -- I should say business or property -- located at

16   4125 Paramount Boulevard in Lakewood which you allege you  17:22

17   visited in September of 2021?

18        A.    No, I don't recall.

19        Q.    Do you remember visiting a property located at

20   3451 Torrance Boulevard in Torrance which you allege you

21   visited in September of 2021?

22        A.    I don't remember.

23        Q.    Do you recall visiting a property located at

24   4903 Torrance Boulevard in Torrance which you allege you   17:23

25   visited on September 26th of 2021?

08/03/2022

JAMES WILLEY SHAYLER

Page 123

```
 1        A.    I don't recall.
 2        Q.    Do you remember visiting a property located at
 3   4435 Torrance Boulevard in Torrance which you allege you
 4   visited in September of 2021?                              17:23
 5        A.    No, I don't recall.
 6        Q.    Do you remember visiting a Vons at 4705
 7   Torrance Boulevard in September of 2021?  This is in
 8   Torrance.
 9        A.    Yeah, I remember Vons.
10        Q.    Have you gone back to visit?
11        A.    It hasn't settled yet.
12        Q.    All right.  Would there be a reason you would    17:24
13   want to go to a Vons all the way in Torrance?
14        A.    In Torrance, there's usually a reason why I'm
15   down there.
16        Q.    Do you remember suing a Men's Wearhouse in
17   Torrance which you allege you visited in September of
18   2021?
19        A.    I don't recall.                                  17:24
20        Q.    This would be 18407 Hawthorne Boulevard.
21        A.    I don't recall.
22        Q.    Do you remember visiting a property located at
23   3405 Sepulveda Boulevard in Torrance which you allege you
24   visited in September of 2021?
25        A.    I don't recall.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 124

| | | |
|---|---|---|
| 1 | Q.   Do you remember visiting a business, Chase | 17:25 |
| 2 | Bank, at 10701 Pico Boulevard in September of 2021? | |
| 3 | A.   I don't -- I have accounts at Chase, so | |
| 4 | sometimes I do visit Chase. | |
| 5 | Q.   Do you remember visiting a property located at | |
| 6 | 3470 South Sepulveda Boulevard in L.A. in September of | 17:25 |
| 7 | 2021? | |
| 8 | A.   I don't recall. | |
| 9 | Q.   Do you remember visiting a property located at | |
| 10 | 833 West Torrance Boulevard in Torrance in October of | |
| 11 | 2021? | |
| 12 | A.   Again I don't recall. | |
| 13 | Q.   If I said it was the Alpine Village would that | |
| 14 | refresh your memory? | 17:26 |
| 15 | A.   Oh, yeah, I know Alpine Village, yeah. | |
| 16 | Q.   Have you been back there? | |
| 17 | A.   I've been back there.  They settled. | |
| 18 | Q.   So did you go back there? | |
| 19 | A.   Yes. | |
| 20 | Q.   Did you buy anything? | |
| 21 | A.   Yeah, I did.  I bought a -- a loaf of bread. | |
| 22 | They make -- they have a good bakery there. | |
| 23 | Q.   How often have you been back there? | |
| 24 | A.   Been there twice. | |
| 25 | Q.   And did you keep the receipts? | 17:26 |

JAMES WILLEY SHAYLER

```
 1       A.    I didn't keep the receipt.  I sent it to my

 2    attorney.

 3       Q.    And do you have the credit card -- invoices on

 4    your credit card?

 5       MR. HASHEMI:  Assumes facts not in evidence.

 6          Go ahead.

 7       THE WITNESS:  I'm not sure if I paid cash or if I

 8    used my credit card.

 9       Q.    BY MR. SAHELIAN:  How often do you pay cash

10    versus using your credit card?

11       A.    Just depends.  If I have the cash on me, I use    17:27

12    it.  If I don't, then I use my credit card.

13       Q.    How many credit cards do you have?

14    **   MR. HASHEMI:  I'm going to instruct not to answer

15    that question, not reasonably calculated to lead to

16    discoverable information, and it is asking for personal

17    financial information.

18       MR. SAHELIAN:  Well, I disagree with you, counsel,

19    because I'm entitled to know whether he's got evidence of

20    having visited somewhere or not.  And part of that is --    17:27

21    part of that evidence is whether he has credit card

22    receipts.

23          So let me -- I'm not interested in prying into

24    his business affairs, so I'll limit it this way.

25       Q.    Mr. Shayler, is there one or more credit cards
```

08/03/2022

JAMES WILLEY SHAYLER

Page 126

1    that you use to purchase items when you visit these

2    businesses that you ultimately end up suing?

3         MR. HASHEMI:  Objection, vague.                          17:28

4         THE WITNESS:  No, I usually don't use credit cards.

5         Q.   BY MR. SAHELIAN:  All right.  You remember

6    suing -- strike that.

7              Do you remember visiting a business at 1190

8    West 190th Street in Gardena in October of 2021?

9         A.   I don't recall.

10        Q.   You remember visiting a property located at

11   17450 -- that's 17450 Avalon Boulevard in Carson in       17:28

12   October of 2021?

13        A.   I do not recall.

14        Q.   All right.  You remember suing a business

15   located at 300 West Victoria Street in Gardena in October

16   of 2021?

17        A.   I don't recall.

18        Q.   Do you remember visiting a property located at  17:29

19   940 East Dominguez Street in October 2021?

20        A.   And I don't recall.

21        Q.   How about 603 East University Drive in Carson

22   in October of 2021?

23        A.   I don't recall.

24        Q.   17952 South Avalon in Carson in October of

25   2021?                                                      17:30

08/03/2022

JAMES WILLEY SHAYLER

Page 127

1       A.      Again I do not recall.

2       Q.      5053 North Huntington Drive in L.A. in October

3   of 2021?

4       A.      Again I do not recall.

5       Q.      1007 East Dominguez Street in Carson in

6   October of 2021?

7       A.      Again I don't recall.

8       Q.      20236 South Avalon Boulevard in Carson which      17:30

9   you visited in October 28, 2021?

10      MR. HASHEMI:  Argumentative, lacks foundation.

11          Go ahead.

12      THE WITNESS:  I don't recall.

13      Q.      BY MR. SAHELIAN:  Do you remember visiting a

14   business located at 20700 South Avalon Boulevard in

15   Carson on October 28, 2021?

16      A.      I don't recall.

17      Q.      All right.  Do you keep track of the            17:31

18   businesses that you sue, Mr. Shayler?

19      MR. HASHEMI:  Objection, vague.

20      THE WITNESS:  No, I do not.

21      Q.      BY MR. SAHELIAN:  Do you have any documents at

22   home that might -- that might help us understand which     17:31

23   businesses you've sued?

24      A.      No, I don't keep any documents.

25      Q.      Do you keep any records of which businesses

08/03/2022

JAMES WILLEY SHAYLER

Page 128

1    you visit after filing a lawsuit?

2         MR. HASHEMI:  Objection, lacks foundation,

3    argumentative, and compound.  Asked and answered.

4             Go ahead.                                    17:31

5         THE WITNESS:  I don't keep any type of records.

6         Q.   BY MR. SAHELIAN:  Did you file ADA lawsuits

7    prior to the year 2019?

8         A.   No.

9         Q.   What was the first ADA lawsuit you ever filed?

10        A.   Again I don't recall the first one I ever     17:32

11   filed.

12        Q.   Do you make it a point to continue visiting

13   all the businesses -- and I will submit to you I have

14   336 -- all the 336 businesses that you've sued regularly?  17:32

15        MR. HASHEMI:  Objection, vague and compound.

16        THE WITNESS:  Yes, I do.

17        Q.   BY MR. SAHELIAN:  So if you don't have any

18   records of which businesses you've sued, how do you

19   remember which ones to go back to?

20        A.   The attorney tells me.

21        Q.   And if the attorney didn't tell you, would you

22   go back to these businesses?                           17:33

23        MR. HASHEMI:  Objection, lacks foundation, calls for

24   speculation, and incomplete hypothetical.

25        THE WITNESS:  Not sure.

SIMPSON DEPOSITION SERVICES (800) 505-9994

JAMES WILLEY SHAYLER

Page 129

```
 1        MR. SAHELIAN:  All right.  I have no further

 2   questions.

 3            Mr. Shayler, thank you for being patient with

 4   me.  I hope you have a nice evening.  I hope your pain in     17:33

 5   your leg goes away and you're able to walk without

 6   experiencing pain.

 7            Mr. Hashemi, I know you're going to have less

 8   pain after you say good-bye to me because you won't have

 9   to deal with me.  So you'll be a much happier man in

10   about two minutes.

11        MR. HASHEMI:  I don't think so, Mr. Sahelian.  I       17:34

12   actually take pleasure in working with you on these

13   matters.

14            I do have -- I'm going to interject a belated

15   objection to every question that was presented that

16   started with "do you remember suing or visiting."  Those

17   all lack foundation.

18                        EXAMINATION

19        Q.   BY MR. HASHEMI:  I do have a couple of

20   follow-ups with respect to the questions, Mr. Shayler.

21            Do you recall earlier today counsel showed you     17:35

22   a photo of you taking a measurement on the ground and

23   where the ground had a crack on it?

24        A.   I remember.

25        Q.   And that photo didn't depict you using a cane
```

08/03/2022

JAMES WILLEY SHAYLER

Page 130

```
 1   or a rollator; did it?                                    17:35
 2        MR. SAHELIAN:  Okay.  Hang on, hang on, I'm going to
 3   voice an objection.  That was leading.  That was
 4   textbook-definition leading, Mr. Hashemi.  But you know
 5   what?  Let him answer it.
 6        MR. HASHEMI:  Okay.
 7        Q.   Please do, Mr. Shayler.
 8        A.   Those cracks were very small.  They are not
 9   going to cause me problems.
10        Q.   My question was a little different.  Were
11   you -- when you took that measurement, were you using     17:35
12   cane or a walker?
13        A.   No, I was having a good day that day.
14        Q.   Is that the reason why you weren't using --
15        A.   Yeah.
16        Q.   -- a cane or a walker?
17        A.   Right.
18        Q.   Please allow me to finish the question.
19        A.   Okay.
20        Q.   I'm no different than Mr. Sahelian, so my
21   questions deserve the same amount of time so that Madam
22   Court Reporter can write them down.
23             Do you remember the back door photos that       17:36
24   counsel showed you?
25        A.   I do.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 131

```
 1       Q.    Those were with respect to the subject
 2   property that we're here for today; right?
 3       A.    That's correct.
 4       Q.    And at the time you exited that back door till
 5   the time you entered your car, did you have to traverse
 6   the access aisle with the alleged excessive slopes?
 7       A.    Yes.
 8       MR. SAHELIAN:  Mr. Shayler, you didn't let me        17:36
 9   interject with my objection.
10       THE WITNESS:  Okay.
11       MR. SAHELIAN:  The question is leading, it is vague,
12   and it lacks foundation.
13       Q.    BY MR. HASHEMI:  The counsel was asking you
14   why -- you know, how you went about traversing that     17:37
15   access aisle.  Did you have a fear of falling while you
16   were traversing that access aisle?
17       THE REPORTER:  I'm having trouble understanding you.
18       MR. SAHELIAN:  Babak, you need to raise your volume.
19       MR. HASHEMI:  I get it.  I think what I'm doing is   17:37
20   I'm not facing the microphone correctly.  So how is that?
21       THE REPORTER:  Better.
22       MR. SAHELIAN:  Enunciate your words.
23       MR. HASHEMI:  This is like second grade again.
24       Q.    From the time --?  What part of the question
25   did you get, Madam Reporter?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 132

```
 1         THE REPORTER:  "Did you have."

 2         MR. SAHELIAN:  Slow down, Babak, slow down.

 3         Q.    BY MR. HASHEMI:  Did you have any fear of

 4    falling while you were traversing the access aisle that      17:38

 5    was depicted in the photo that counsel showed you?

 6         A.    As long as I have my walker, I felt -- I

 7    didn't think I was going to fall, but I -- I had to have

 8    my walker that day.

 9         Q.    Okay.  Would you have been able to traverse

10    that access aisle without a walker that day?

11         A.    Without a walker, not that day.                    17:38

12         Q.    Okay.  And would you have been able to

13    traverse that access aisle with a cane that day?

14         A.    No.

15         Q.    What was --?  Why was that?

16         A.    My -- my legs were unsteady and shaking.  You

17    know?  I just -- they were -- they were unsteady.

18         Q.    And was that the cause of your anxiety, sir?

19         MR. SAHELIAN:  Now that was a leading --                 17:39

20         THE WITNESS:  (Simultaneous dialog.)

21         MR. SAHELIAN:  Slow down.  That was a leading

22    question.  Okay?  The proper way to ask that question

23    would have been, "What did you experience."  But you get

24    my point, Babak.  Go ahead.

25         Q.    BY MR. HASHEMI:  These are follow-up
```

08/03/2022

JAMES WILLEY SHAYLER

Page 133

```
 1   questions.  I think a judge would rule differently, but
 2   go ahead, Mr. Shayler.
 3        A.    Say the question again?
 4        MR. HASHEMI:  Madam Reporter, may I ask that you
 5   read the question, please.
 6             (The record was read as follows:
 7              "And was that the cause of your anxiety,        17:39
 8          sir?")
 9        THE WITNESS:  Yes.                                    17:40
10        Q.    BY MR. HASHEMI:  Okay.  What specifically
11   caused you anxiety?
12        A.    The slope of -- the slope of the access aisle.
13        Q.    Was there --?  Was there an emotion that
14   caused you that anxiety, sir?
15        A.    An emotion?
16        Q.    Yes.
17        A.    No, there wasn't a --.  I'm not sure of the     17:40
18   answer to that.
19        Q.    Did you -- did you experience fear?
20        A.    Yeah.
21        MR. SAHELIAN:  Well, that right there was leading
22   again.  That was leading again, Mr. Hashemi.  Come on.
23        Q.    BY MR. HASHEMI:  Why would you experience
24   fear?
25        A.    I had fear because I had to traverse against
```

08/03/2022

JAMES WILLEY SHAYLER

Page 134

 1    that slope.

 2          Q.    What is that fear of?

 3          A.    Fear of falling.                              17:40

 4          Q.    You testified that you've fallen three or four

 5    times just in the past 12 months; correct?

 6          A.    Yes, I have.

 7          Q.    Has your medical condition changed in the past

 8    12 months where you would be subject to -- strike that.

 9                Has your medical condition changed in any way

10    in the last 12 months that would affect your fear of

11    falling?

12          A.    Yes, it has increased.                       17:41

13          Q.    Has that fear of falling affected your ability

14    to traverse grounds where there's an excessive slope?

15          A.    Yes.

16          MR. SAHELIAN:  Vague as to excessive slope.

17                Go ahead.

18          MR. HASHEMI:  Thank you.                           17:42

19          Q.    And with respect to the experience that you

20    had with slopes, are you able to gauge whether a slope of

21    a ground is acceptable or not just by standing on it or

22    traversing on it?

23          A.    Yes.

24          Q.    And how are you able to gauge that?

25          A.    By how much I'm -- by seeing how much the lean

JAMES WILLEY SHAYLER

Page 135

1   on the slope is.

2       Q.    The lean on your body or lean on -- I'm not          17:42

3   sure I understand.

4       A.    Lean on my body.

5       Q.    Okay.  How does that affect -- what -- can you

6   explain how -- what you mean by lean on your body?

7       A.    Well, I can see my body leaning a certain --

8   certain way, and I can just tell that the slope is

9   greater or -- than it should be.

10      Q.    Does that put more pressure on one knee than

11  the other?

12      MR. SAHELIAN:  Leading.  Leading.  Stop.  That was       17:42

13  textbook-leading --

14      Q.    BY MR. HASHEMI:  Does that --

15      MR. SAHELIAN:  -- question.  Objection.

16      Q.    BY MR. HASHEMI:  Does that also affect your

17  ability to hold your assistive device with your right

18  arm?  Right hand.

19      MR. SAHELIAN:  That's leading also, counsel.  That

20  is another textbook-leading question.

21      THE WITNESS:  Yes, it causes me to have to tighten

22  my -- my hand or...

23      Q.    BY MR. HASHEMI:  Does that cause you pain?        17:43

24      A.    Yes.  Sure it does.

25      MR. HASHEMI:  Nothing further.

08/03/2022

JAMES WILLEY SHAYLER

Page 136

1                    FURTHER EXAMINATION

2        Q.    BY MR. SAHELIAN:  All right.  So, Mr. Shayler,

3   you're convinced on the day you visited the Irish Pub you

4   were having -- what? -- good day, bad day, or what kind          17:43

5   of a day?

6        A.    That was a bad day.

7        Q.    That was a bad day.  All right.  So September

8   15th was a bad day, correct, 2021?

9        A.    That was a bad day.

10       Q.    Okay.  What about September 14th?  Was that a

11  bad day?

12       A.    I can't remember it was a bad day or a good

13  day.  I don't -- I don't remember.

14       Q.    All right.  So that September 14, 2021, you

15  don't remember if it was a good day, bad day.  What about       17:44

16  September 13 of 2021?  How was that day?

17       A.    I -- I don't recall.

18       Q.    All right.  What about September 16 of 2021?

19  Was that a good day or a bad day?

20       A.    September 16th of '21.  I don't recall.

21       Q.    What about September 17th of 2021?  Was that a

22  good day or a bad day?

23       A.    I don't recall.                                       17:45

24       Q.    What about September 18 of 2021?  Was that a

25  good day or a bad day?

JAMES WILLEY SHAYLER

```
 1        A.    If I was using my walker, it would be a bad

 2   day.  If I was using my cane or able to walk, then it

 3   would be a good day.

 4        Q.    All right.  Which were you using that day?

 5        A.    Again I do not recall.

 6        Q.    Did you write it anywhere?

 7        A.    I do not write that down which days I use and

 8   which time I don't.                                         17:45

 9        Q.    So --

10        A.    I can tell in the morning.

11        Q.    So if we were to go back and try to figure out

12   over the past year which one of your days were bad days

13   and which ones were good days, how would we do that?

14        A.    I'm not sure how we would do that.

15        Q.    All right.  Fair answer.  So let's look back

16   for a moment.  In the past year, can you name the         17:45

17   restaurants that you've sued in the past 12 months?

18   Strike that.  Let me rephrase it.

19             Can you name the restaurants that you visited

20   and then sued in the past 12 months?

21        A.    I cannot.

22        Q.    Can you name a single one?

23        A.    Single restaurant?

24        Q.    That you have visited and then sued.  In the

25   past 12 months.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 138

```
 1        A.    Um, I can't recall -- I can't recall what        17:46
 2   restaurants I've sued and visited.  I can't recall that.
 3        Q.    Can you name the liquor stores that you have
 4   visited and then sued in the past 12 months?
 5        A.    Yeah, I don't know whether they've been sued
 6   or not.  I send the evidence to my attorney and whether    17:46
 7   they sue them or not, I don't know.
 8        Q.    Can you name the grocery stores that you have
 9   visited and then sued in the past 12 months?
10        MR. HASHEMI:  Objection, compound.  Overbroad.  Now
11   harassing.
12        THE WITNESS:  Yeah, Ralphs and Vons.
13        Q.    BY MR. SAHELIAN:  Any others?
14        A.    None that I recall.  I just know Ralphs and
15   Vons.                                                       17:47
16        Q.    Can you name any gas stations that you have
17   visited and then sued in the past 12 months?
18        A.    No gas stations.
19        Q.    Can you name any other retail stores that you
20   have visited and sued in the past 12 months?
21        A.    Manny Moe & Jack's.  Um, I can't recall any
22   other ones.
23        Q.    All right.  Same question but 24 months back,    17:47
24   can you remember any restaurants that you have visited
25   and then sued in the past 24 months?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 139

```
 1       A.    I can't recall the restaurants that were sued

 2   or not sued.  I can't recall.

 3       Q.    Can you name any liquor stores that you have      17:48

 4   visited and then sued in the past 24 months?

 5       MR. HASHEMI:  Overbroad.

 6       THE WITNESS:  J & B Liquor, Island Liquor.  Those

 7   are a couple I can remember.

 8       Q.    BY MR. SAHELIAN:  When was the last time you      17:48

 9   went to any to purchase an item?

10       A.    Say that again?

11       MR. SAHELIAN:  Madam Court Reporter?

12             (The record was read as follows:

13               "When was the last time you went to any to

14           purchase an item?")

15       THE WITNESS:  Any store or --

16       Q.    BY MR. SAHELIAN:  Either of those two liquor

17   stores.

18       A.    Sometime last year.

19       Q.    Did you keep records?

20       A.    No.

21       Q.    Can you name the grocery stores that you         17:49

22   visited and then sued in the past 24 months?

23       MR. HASHEMI:  Overbroad.

24       THE WITNESS:  Ralphs and Vons.

25       Q.    BY MR. SAHELIAN:  Any others?
```

08/03/2022

JAMES WILLEY SHAYLER

Page 140

```
 1      A.    I don't recall their names.

 2      Q.    Can you name any retail store, any other

 3   retail stores that you have --                          17:49

 4      A.    That --

 5      Q.    One moment.  Let me finish.

 6            Can you name any other retail stores that you

 7   have visited and then sued in the past 24 months?

 8      MR. HASHEMI:  Overbroad.

 9      THE WITNESS:  99 Cent Store.

10      Q.    BY MR. SAHELIAN:  Any others?                   17:50

11      A.    That's all I can remember.  99 Cent Store.

12      Q.    All right.  Of the 336 lawsuits, lawsuits

13   which I will submit you've filed since March of 2019, how

14   many of the businesses can you name?  Take your time.

15      A.    I don't keep track of the businesses that I've  17:50

16   sued.

17      Q.    I am not asking you whether you keep track or

18   not.  I'm asking you right now.  As you sit here, as you

19   and I are talking, of the 336 lawsuits that you've filed,  17:51

20   how many of the businesses can you name that you've sued?

21      MR. HASHEMI:  Objection, compound.  Harassing.

22      THE WITNESS:  I can name a few.  Like I said, Vons,

23   99 Cent Store, Ralphs.                                   17:51

24      Q.    BY MR. SAHELIAN:  Take your time.

25      A.    That's it.  That's all I can remember.
```

08/03/2022

JAMES WILLEY SHAYLER

Page 141

1      Q.    Well, you mentioned Pep Boys a while ago.

2      A.    Pep Boys.

3      Q.    How about the Irish Pub?

4      A.    Irish Pub.

5      Q.    Okay.  Take your time.

6      A.    Not going to help my memory.

7      Q.    Did you need a break maybe to remember some      17:52

8  additional ones?

9      A.    No.

10     Q.    Is that a no?

11     A.    No.

12     Q.    Any other businesses that you remember

13  visiting and then suing?

14     MR. HASHEMI:  Objection, asked and answered.

15     THE WITNESS:  I don't recall businesses that I sued.

16  Okay?                                                    17:52

17     MR. SAHELIAN:  Okay.  Thank you, Mr. Shayler.  I

18  appreciate your time.

19            Any further questions, Mr. Hashemi?

20                    FURTHER EXAMINATION

21     Q.    BY MR. HASHEMI:  Mr. Shayler, with respect to

22  the good and bad days that we're talking about, is it

23  possible that a good day can turn into a bad day or a bad

24  day can turn into a good day, all within the same day?    17:53

25     A.    If I'm have --.  Yes, it can.  Usually if I'm

08/03/2022

JAMES WILLEY SHAYLER

Page 142

1   having a bad day, though, I don't take a chance.

2        Q.    Okay.

3        A.    But a bad day -- a good day can turn into a

4   bad.

5        Q.    Okay.  And is there any indication of how a

6   good day can turn into a bad day?  Are you able to

7   predict that in any way?                                    17:53

8        A.    No, I can't predict.  I just try not to stress

9   myself and overwork my legs.

10       Q.    Okay.  So on a good day, you try to maintain

11  your movements in such a way that you don't overstress?

12       MR. SAHELIAN:  Okay, you're now leading.  You're now

13  leading.  I'm going to object.

14       MR. HASHEMI:  I'm not --

15       MR. SAHELIAN:  I'm going to object to this line.

16       MR. HASHEMI:  I'm not -- I'm not done with the        17:54

17  question for an objection to be lodged.  So...

18       Q.    On a good day, you carry yourself in such a

19  way that hopefully it doesn't turn into a bad day.  But

20  on a bad day, is it -- am I correct in understanding that

21  a bad day doesn't turn into a good day; correct?

22       A.    Right.

23       Q.    Okay.

24       A.    I just don't take that chance because --

25  because if I fall, I can't get up.

08/03/2022

JAMES WILLEY SHAYLER

Page 143

 1          MR. HASHEMI:  Right.  Okay.  Nothing further.          17:54

 2          MR. SAHELIAN:  All right.  Now, Mr. Shayler, I'm

 3     going to give you Mr. Hashemi's cell phone number.  Any

 4     time you have a bad day, you call him and he'll cheer you

 5     up.  He will make it a good day.

 6          MR. HASHEMI:  And I will put a permanent forwarding

 7     from my phone number to Mr. Sahelian so that way he will

 8     have to reject your call as long as he's counsel of

 9     record.

10          MR. SAHELIAN:  Absolutely.  I will cheer up anybody.

11     Ask anybody that knows me.  I will cheer them up.          17:55

12            All right.  Thank you very much, everyone.

13          THE REPORTER:  Babak, do you need a copy?

14          MR. HASHEMI:  Yes.

15                    *   *   *   *   *

16          (Deposition proceedings concluded at 5:56 p.m.)

17          (Declaration under penalty of perjury on the

18     following page hereof.)

19

20

21

22

23

24

25

08/03/2022

JAMES WILLEY SHAYLER

Page 144

1                    DECLARATION RE DEPONENT'S READING,

2                  CORRECTING AND SIGNING DEPOSITION

3

4        I hereby declare under penalty of perjury that the

5     foregoing is my deposition under oath; are the questions

6     asked of me and my answers thereto; that I have read same

7     and have made the necessary corrections, additions or

8     changes to my answers that I deem necessary.

9

10       IN WITNESS THEREOF, I hereby subscribe my name this

11    _____ day of _____, 202____.

12

13

14            _____

15                      JAMES WILLEY SHAYLER

16

17

18

19

20

21

22

23

24

25

08/03/2022

JAMES WILLEY SHAYLER

Page 145

```
 1
 2
 3                    REPORTER'S CERTIFICATE
 4
 5
 6            The undersigned Certified Shorthand Reporter
 7    licensed in the State of California does hereby certify:
 8            That the foregoing deposition was taken by me
 9    at the time and at the location of the witness, at which
10    time the witness was duly sworn by me;
11            That the testimony of the witness and all
12    objections made at the time of the examination were
13    recorded stenographically by me to the best of my ability
14    to understand the witness and were thereafter
15    transcribed, said transcript being a true copy of my
16    shorthand notes thereof.
17            The dismantling, unsealing, or unbinding of the
18    original transcript will render the Reporter's
19    Certificate null and void.
20            In witness whereof, I have subscribed my name
21    this date:  8/11/2022.
22
23            Linda A. Simpson
24    _____
25            Linda A. Simpson, CSR, RPR, RMR, CRR, CCRR
                    Certificate Number 2266
```

SIMPSON DEPOSITION SERVICES (800) 505-9994